Joyce H. MARTIN, Executrix of the Estate of Benjamin Wilson Martin, Deceased, Mrs. Georgia G. Hendrickson, Administratrix of the Estate of Homer Hendrickson, Deceased, Sandra Allison, Individually and as next friend of Arthur J. Allison, Jr. and Lawrence Allison, minors, Mrs. J. B. Allison, Jack Allison, Mrs. Carlene Arnold Smith, Steven Lee Smith and Ragsdale Aviation, Inc., Plaintiffs,

v.

UNITED STATES of America, Defendant and Third-Party Plaintiff,

v.

BEN W. MARTIN ENTERPRISES, INC., Martin Terminals Company and Logicon, Inc., Third-Party Defendants.

Nos. PB–75–C–14, PB–75–C–117, PB–75–C–234, PB–75–C–252 and PB–76–C–110.

United States District Court,
E. D. Arkansas,
Pine Bluff Division.

Nov. 29, 1977.

Coleman, Gantt, Ramsey & Cox, Pine Bluff, Ark., for Martin.

Henry Woods, Little Rock, Ark., and Charles B. Roscopf, Helena, Ark., for Hendrickson.

Tom Davis, Austin, Tex., for Allisons.

Ed Staten, Pine Bluff, Ark., and Silas B. Cooper, Jr., Abbeville, La., for Smiths.

William Overton, Little Rock, Ark., for Ragsdale.

Richard Pence, Asst. U. S. Atty., Little Rock, Ark., and Don Sime, FAA, Washington, D. C., for the U. S.

## MEMORANDUM OPINION

OREN HARRIS, Senior District Judge.

The above numbered cases were commenced by the filing of complaints on behalf of the widows, survivors and estates of four men who were killed in the crash of an airplane, and by the owner of the airplane. Defendants included the alleged pilot of the airplane, the alleged corporate employers of the alleged pilot or pilots, and the United States of America. As all of the cases arose out of the same incident, they were consolidated and scheduled for trial, the claims against the individual and corporate defendants to be determined by a jury and the same jury to be utilized as an advisory jury as to the claims against the United States. Shortly prior to the scheduled trial date the Court was informed that all claims had been settled by the parties, with the exception of the claims against the United States and the counter and cross-claims asserted by the United States.

After the settlements, the pleadings were re-examined. The remaining parties, and their respective contentions, were determined to be as follows:

Joyce H. Martin, executrix of the estate of Benjamin Wilson Martin, claims damages on behalf of the estate and the survivors of Martin for wrongful death. Defendant is the United States. Martin was a qualified pilot, an occupant of a front seat of the aircraft, a highly successful businessman, and principal owner and controlling officer of Ben W. Martin Enterprises, Inc., Martin Terminals Company and Logicon, Inc.

Martin's survivors, for whom claim is made pursuant to the provisions of the Arkansas Wrongful Death Act, include his widow, one son, three daughters, his mother and two sisters.

Mrs. Georgia G. Hendrickson, administratrix of the estate of Homer Hendrickson, deceased, claims damages on behalf of the estate and the survivors of Hendrickson for wrongful death. Hendrickson was a rear seat passenger on the aircraft. He had a successful career in journalism and, at the time of his death, was a public relations representative of the American Waterways Association. His survivors include a widow, two daughters and one son.

Mrs. Carlene Arnold Smith and Steven Lee Smith claim damages for the wrongful death of Marvin L. Smith. Smith was an employee of one or more of Martin's corporations and was a rear seat passenger on the airplane. Plaintiffs are his widow and son.

Sandra Allison, individually and as next friend of Arthur J. Allison, Jr., and Lawrence Allison, minors, Mrs. J. B. Allison and Jack Allison, the widow, two sons, mother and brother of Arthur J. Allison, claim damages for his wrongful death. Allison was a qualified pilot, an occupant of a front seat of the airplane, an employee of Ragsdale Aviation, Inc.

Ragsdale Aviation, Inc., was the owner of the aircraft, a Cessna 414, twin engine aircraft, registration number N44JG. Ragsdale claims damages for the value of the airplane, which was destroyed in the crash.

Each of these plaintiffs claims that the United States is liable, under the Federal Tort Claims Act, by reason of the alleged negligence of one or more air traffic controllers, who were acting within the course and scope of their employment by the Federal Aviation Administration, an agency of the United States government.

The United States denies that the controllers were guilty of any negligence which was a proximate cause of the accident, asserts that Martin and Allison were both guilty of negligence which was the sole

proximate cause of the crash, and asserts cross and counter-claims against Martin, the three corporations owned and controlled by Martin, and Ragsdale Aviation, Inc., Allison's employer, for contribution should it be determined that the United States is liable for any damages.

The consolidated cause was tried to the Court, without the intervention of a jury, commencing on June 13, 1977 and continuing through June 16, 1977. The Martins were represented by Messrs. John Lile, Martin Gilbert and Harley Cox. The Hendricksons were represented by Messrs. Henry Woods and Charles Roscopf. The Allisons were represented by Hon. Tom Davis. The Smiths were represented by Messrs. Ed Staten, Silas Cooper and John Ortego. Ragsdale was represented by Messrs. William Overton and Gus Walton, Jr. The United States was represented by Assistant United States Attorney Richard Pence and Hon. Don Sime of the Federal Aviation Administration legal staff. All parties were well and ably represented.

The court heard and received evidence in the form of oral testimony, depositions and exhibits over a period of four full days of trial. The parties also filed a pre-trial stipulation and pre-trial briefs. After all parties had rested, counsel were given a substantial time within which to file post-trial briefs, proposed findings of fact and conclusions of law, and responses. All such filings are now complete and the cause is submitted for decision.

After careful consideration of the pleadings, the stipulation of the parties, the evidence, the proposed findings of fact and conclusions and the briefs and contentions of counsel, the Court makes the following findings of fact and conclusions of law, which are incorporated herein pursuant to Rule 52, Federal Rules of Civil Procedure:

These consolidated proceedings involve claims against the United States of America, plaintiffs alleging that air traffic controllers, employees of the Federal Aviation Administration were negligent in the performance of their official duties. This Court, therefore, has jurisdiction pursuant to 28 U.S.C. § 1346(b) and (c). Venue lies in this district pursuant to 28 U.S.C. § 1402(b), as the acts and omissions complained of and the crash of the aircraft occurred within this district.

The great majority of the facts are either stipulated or virtually undisputed. The aircraft involved was a Cessna 414, twin engine, bearing registration number N44JG, by which number or abbreviations thereof it will henceforth be referred to. The aircraft was owned by Ragsdale Aviation, Inc. Allison, an employee of Ragsdale, was a highly qualified pilot with multi-engine, commercial and instrument ratings. He piloted the plane to New Orleans, Louisiana and there met Martin, who was interested in purchasing such an airplane for Logicon, Inc., a corporation of which he was major owner and managing officer. A flight from New Orleans to Pine Bluff, Arkansas had been arranged to permit Martin to examine and test fly the aircraft.

Martin was also a highly qualified pilot, holding multi-engine and instrument ratings. The aircraft was equipped with dual flight controls and dual flight instruments, so that it could be flown from either the left or right front seats. It was customary for potential purchasers taking demonstration rides to be placed in the left front seat and for the owner's demonstrator pilot to take the right front seat. From all of the evidence, the Court finds that Martin was seated in the left front seat and Allison in the right front seat of N44JG during the flight. The two non-pilot occupants of the plane, Hendrickson and Smith, were seated in the cabin, without any instruments or controls.

N44JG departed from the Lake Front Airport, New Orleans, Louisiana, at approximately 5:24 P.M., Central Standard Time, on December 6, 1974, en route to Pine Bluff, Arkansas. The flight was under instrument flight rules (IFR). N44JG was given a general weather briefing for the entire state of Arkansas at 6:30 P.M. by the Greenwood, Mississippi F.A.A. Flight Service Station. The report indicated that all weather in the state was near or below the

minimums of visibility which would permit a landing on instruments. Greenwood Flight Service Station also gave N44JG the Memphis, Tennessee conditions and forecast and suggested Memphis as the closest alternate field at which a landing might be made, should N44JG be unable to land at Pine Bluff. N44JG stated to Greenwood FSS by radio that they would continue to Pine Bluff, attempt one approach for landing, and divert to Memphis should the approach not permit the aircraft to land at Pine Bluff.

Pine Bluff airport is not equipped with radar, instrument landing systems, or other aids to permit a "precision" aided approach to landing. When weather conditions are such that an approach to land must be made under instrument flight rules, the only available method is what is known as a "VOR" approach.

Although referred to as a "non-precision" approach to a landing, a "VOR" approach is precisely defined and requires a certain flight path to be followed, closely controlled as to direction, altitude, rate of descent, speed and time. The flight path is described in detail on what is known as an approach plate, a schematic and written depiction of the flight path to be followed. The flight path is to be followed until a certain altitude is reached, known as the minimum descent altitude (MDA). This altitude must be maintained, according to regulations of the FAA, until such time as the pilot is able to see markings identifiable with the approach end of the airport runway and the aircraft is in such a position that a normal descent to a landing on the runway can be made visually. Federal Aviation Regulation (FAR) § 91.117.

Pine Bluff VOR, an omni-directional radio beacon broadcasting facility, is located 3.9 nautical miles almost due North of the Pine Bluff airport. An approach to Pine Bluff designated as "VOR Runway 17" is published in the form of an approach plate, and was in use by the pilot of N44JG. Pursuant to the directions of the plate, an aircraft using the approach must pass over the Pine Bluff VOR at an altitude of 1200 feet above sea level (MSL) and use its omni-directional bearing indicator radio receiver to maintain a direction 181 degrees from the VOR toward the runway. The published MDA for this approach is given on the approach plate as 580 feet MSL, which would be 374 feet above the ground level at the vicinity of the Pine Bluff runway.

A pilot may not descend below the MDA established for an instrument approach unless he has visual sighting of markings identifiable with the approach end of the airport runway and is in a position to make a normal approach and descent to a landing while maintaining visual contact with the runway environment. To do so would constitute a violation of Federal Aviation Regulation § 91.117, and would subject the pilot to possible sanctions by the FAA, as well as subjecting the pilot, plane and passengers to unreasonable risk of a crash.

N44JG was well equipped with instruments. The instruments involved in IFR flight and approach included radio transceivers permitting communications with FAA control and information personnel; radio receivers permitting reception of signals from VOR, omni-directional radio beacons, which were translated by means of a display on the instrument to indicate the precise direction to be flown; artificial horizons, which gave the pilots references by which to determine the angle of the wings to the horizon and the fore and aft alignment to level flight; airspeed indicators, which permitted the pilots to determine their indicated airspeed; rate of descent or climb indicators; a radar transponder with reporting altimeter, an instrument which transmits signals received by a radar station which signals identify the aircraft and display its altitude on the radar scope of the ground radar station; and barometric altimeters which, when the correct barometric pressure is set into them by means of a dial, indicate the altitude of the aircraft above mean sea level. These flight instruments and navigation aids were duplicated, so that the aircraft could be flown equally well from either of the two front seats. The left front seat position was also

equipped with a boom or arm which held a radio transmitter microphone positioned for easy transmissions by the occupant of that seat, and a push-button on the control wheel by which the radio transmitter could be turned on and off easily and conveniently, without the hands being removed from the control wheel.

N44JG also had facilities for receiving glideslope radio signals, marker beacon signals, for "precision" approaches where an instrument landing system was available. Pine Bluff did not have such instrument landing system facilities. The airplane also was equipped with distance measuring equipment (DME), which utilized signals from the VOR station to determine the precise distance of the aircraft from the VOR to which the navigation radio receiver was tuned. This information was displayed for the pilot on a DME indicator.

Pine Bluff airport had a control tower staffed by the Federal Aviation Administration with air traffic control personnel. The FAA facility did not have radar facilities, did not have glideslope transmitting facilities, but did not have a weather station. An instrument in the facility indicated the precise barometric pressure. Other weather information was to be determined, under guidelines and regulations of the FAA, by visual observations of the controllers, who were trained to make such observations. In addition to reading the barometric pressure from the instrument, weather observations included an observation and determination of the horizontal distance of clear visibility, referred to as visibility, and the vertical distance or height above ground level of clear visibility, referred to as ceiling. Other observed conditions, such as precipitation, fog, etc. . . are included in weather observations.

N44JG was directed by the Memphis FAA controller to contact Little Rock FAA approach control by radio. Little Rock approach control was manned by Javier Ferdinand Espejo, an army enlisted air traffic controller trainee, being trained and supervised by an FAA journeyman air traffic controller. Little Rock approach control was equipped with radar transmitting and receiving equipment. However, Mr. Espejo did not attempt to achieve radar contact with N44JG or to positively identify the aircraft by means of a directed turn or by a request that the aircraft transmit a transponder code which would have displayed a positive identification of the aircraft and, by means of the encoding altimeter, have displayed the altitude of the aircraft on the radar display scope to enable Mr. Espejo to follow the position, direction and altitude of the flight path of N44JG and to thus better assist the pilot of the aircraft in his approach to landing. Mr. Espejo did not make an attempt to establish such positive radar contact with N44JG, despite the fact that N44JG was the only aircraft within his responsibility at the time.

The Pine Bluff FAA facility was manned by John Michael Ray, a controller trainee employee of the FAA, who had only approximately one month's experience as a trainee. He was supervised by Rolland Downhour, an experienced air traffic controller employee of the FAA, whose duty and responsibility was to monitor the actions, observations and communications of Mr. Ray, and to immediately correct any mistakes. Espejo, Ray and Downhour were all acting within the course and scope of their employment by the United States, and their actions are imputed to the United States in determining any liability of the United States pursuant to the Federal Tort Claims Act.

As the flight of N44JG progressed toward Pine Bluff, Memphis FAA cleared N44JG to descend to an altitude of 6,000 feet and informed the aircraft the altimeter setting to be dialed into the instrument on the aircraft was 29.80. Little Rock approach control, Mr. Espejo, then contacted N44JG by radio and directed a descent to 5,000 feet and told them to expect a "VOR 17 approach" to Grider Field, the Pine Bluff airport. The flight was first contacted by Little Rock at approximately 6:55 P.M., central standard time (CST).

Recordings of the radio transmissions between the FAA facilities and the aircraft

and between the FAA facilities on telephone lines (not audible to the aircraft) were made. Both the recordings and transcripts thereof were placed in evidence. Excerpts from these transmissions are quoted as pertinent.

Times shown are changed to CST. Speakers are identified as follows: LIT—Espejo at Little Rock Approach, Radar East; PBF—Ray at Pine Bluff Tower; 44JG—Voice on radio from 44JG, identified as Martin.

6:55 44JG: Little Rock Approach, four four juliet golf over.

LIT: Twin Cessna four four juliet golf, Little Rock approach. What's your position in relation to the VORTAC sir?

44JG: Uh we're nineteen miles uh radial one two zero, over.

LIT: Twin Cessna four juliet golf descend and maintain five thousand and expect VOR runway one seven approach at Grider Field. Measured ceiling three hundred, overcast, visibility one mile, light drizzle and fog, wind one two zero degrees at five, altimeter two niner eight zero.

44JG: Uh two niner eight zero, we are leaving six for five and I anticipate uh one seven VOR approach.

\* \* \* \* \* \*

7:08
44JG: Juliet Golf we are level at three.

LIT: Twin Cessna four juliet golf clear for VOR runway one seven approach.

44JG: Uh cleared for the approach roger.

\* \* \* \* \* \*

7:09 44JG: Pine Bluff tower, twin Cessna 4 4 juliet golf, over.

PBF: Twin Cessna 4 4 juliet golf, Pine Bluff Tower, runway 1 7, wind 060 degrees at 4, altimeter 29.80, report the VOR inbound.

7:10 44JG: Report the VOR, roger, we're 3 miles out.

7:12 44JG: Ah this is 4 juliet golf over the VOR. Did 21 Mike make it in?

PBF: Twin Cessna 4 juliet golf, that's affirmative, check wheels down, cleared to land, the strobe lights are reported operative, the runway lights are at the highest intensity, advise if you request them to be turned down.

44JG: Roger, leave them on bright for me, what did he break out at, do you know?

PBF: Negative, the a, the baron, correction, Aztec just before him reported that ah 300 feet was the approximate base.

7:13
44JG: Juliet Golf, well, we're going around, we missed it.

PBF: Cessna 4 juliet golf, roger, remain this frequency.

\* \* \* \* \* \*

7:15 LIT: Twin Cessna 44 juliet golf, roger and, uh, like to try another VOR approach?

44JG: Roger, we'll try one more time. We just, uh, didn't quite catch the lights soon enough.

7:16
LIT: Twin Cessna, twin Cessna 4 juliet golf, roger, you are clear for a VOR runway 17 approach and the weather remains the same. Measured ceiling 300, overcast, visibility one mile, light drizzle and fog, wind 120 at 5, altimeter 29.80, report VOR outbound.

44JG: VOR outbound, roger.

\* \* \* \* \* \*

#LIT: OK, reference twin Cessna 4 juliet golf, he's about two miles southwest of the VORTAC, he's going to try another VOR runway 17.

#PBF: OK, we're just fixing to come out with some special weather.

#LIT: What, better or worse?

#PBF: Worse, lower visibility, ah, standby, I'll call you back just . . .

7:18 44JG: Uh, this is, uh, juliet golf, uh, we didn't report over the VOR. We're already two miles north of it, over.

LIT: Twin Cessna 4 juliet golf, roger, report procedure turn inbound.

44JG: Uh, procedure turn inbound, roger.

7:20
44JG: This is juliet golf, turning inbound from procedure.

7:21 LIT: Twin Cessna 4 juliet golf, roger, contact Pine Bluff Tower on 118.4.

\* \* \* \* \* \*

7:21 44JG: Tower, this is 4 juliet golf turning inbound for the VOR.

PBF: Twin Cessna 4 juliet golf, Pine Bluff Tower, wind calm, ALTIMETER TWO NINER NINER ZERO, report the VOR inbound.

44JG: Report the VOR inbound.

7:25
PBF: Twin Cessna 4 juliet golf, new Pine Bluff visibility three-quarters, light drizzle and fog.

44JG: Juliet golf, thank you.

7:26
7:26:23/ 44JG: Juliet golf, over the VOR.

7:26:27 PBF: Twin Cessna 4 juliet golf, roger, check wheels down, cleared to land, new Pine Bluff weather, indefinite ceiling, sky obscured, visibility three-quarters, drizzle and fog, wind calm, altimeter two niner eight zero.

1. Transmissions marked "#" are by land line (telephone) between the controllers at Little Rock and Pine Bluff, and are not audible to aircraft.

There were further transmissions between the controllers and attempts to contact N44JG by radio on both Little Rock and Pine Bluff frequencies, and by broadcast over the navigation radio frequency of the VOR. No further transmissions were received. It is apparent that controller Espejo had followed the progress of N44JG on his radar scope, to some extent, despite his protestations that he had not "positively identified" the aircraft, as he states to controller Ray, after the plane was not contacted, that "We saw him go between the VOR and the airport".

Local authorities were contacted and the wreckage of N44JG was discovered in a wooded area some 1.3 nautical miles north of runway 17 at Grider Field. The aircraft was a total loss. All aboard were killed.

The aircraft initially struck the small top branches of a tree approximately 60′ tall. 187′ further along the flight path, the left wing stuck a 50′ tall Oak tree, approximately 10′ below the tree top. It then continued through a heavily wooded area for an additional 263′ where it came to rest inverted. The terrain from the VOR to the end of Runway 17 is flat and the wooded area where the crash occurred is about 100 yards North of an open field.

As it so often happens in the case of an airplane crash, there were no eyewitnesses to this tragic accident. The substantial testimony presented in the case, of necessity, relies on recorded incidents, records, uncontroverted facts, substantial stipulations of the parties and expert opinions. Before reaching the critical issues, some preliminary requirements should be noted.

The Federal Aviation Regulations provide, inter alia, that:

"The pilot in command of an aircraft is primarily responsible for, and is the final authority as to, the operation of that aircraft." 14 C.F.R. 91.3(a)

 Courts have recognized that government regulations, having the force and effect of law, provide that a pilot retain primary responsibility for the movement of the aircraft. However, before a pilot can be held legally responsible, he must be supplied with those pertinent facts that he is not in a position to know for himself. Those pertinent facts which the controller is expected to provide to pilots include current weather. *American Airlines, Inc. v. U. S.,* 418 F.2d 180 (5 Cir. 1969); *Hartz v. U. S.,* 387 F.2d 870 (5 Cir. 1968); *Ingham v. U. S.,* 373 F.2d 227 (2 Cir. 1967), cert. denied 389 U.S. 931, 88 S.Ct. 295, 19 L.Ed.2d 292 (1968); *Todd v. U. S.,* 384 F.Supp. 1284, 1291 (D.C.1975). Current weather that the controller is expected to communicate includes the latest ceiling and visibility information with the appropriate altimeter setting. *DeWeese v. U. S.,* 419 F.Supp. 147 (D.C.1974).

Pursuant to the Federal Aviation Act, and regulations authorized in the act, FAA established a National Air Traffic Control System. The purpose of the Air Traffic Control System (ATC), is "to provide for the safe, ordinary and expeditious flow of air traffic." 14 C.F.R. § 65.45(a); Terminal Air Traffic Control Manual 7110.8C, paragraph 23.

FAA Terminal Aircraft Traffic Control Manual 7110.8C further provides:

" * * *

200. CURRENT SETTINGS.

a. Issue current altimeter settings obtained from direct-reading instruments or received directly from weather reporting stations.

360. RESPONSIBILITY.

Controllers responsible for taking weather observations or for reporting visibility observations shall do so in accordance with instructions published in the appropriate paragraphs of Abridged Federal Meteorological Handbook Number 1 (FMH # 1), Surface Observations. Weather and visibility observing is a secondary function with respect to the primary functions of traffic control.

(It should be noted that N44JG was the only plane in the area to be observed by the Controllers.)

From the Federal Meteorological Handbook No. 1, Surface Observations:

CHAPTER A–1.

8. Observer Responsibility. Observers are expected to be alert to situations conducive to significant changes in weather conditions and to take and disseminate special and local observations as rapidly as feasible whenever changes are noted that meet the criteria specified in Chapter A–2.

CHAPTER A–2.

3.7.2. Special Observations (s). . . . Take, record, and disseminate a Special Observation whenever any of the following are observed to occur:

(b) Sky Condition. A layer of clouds or obscuring phenomena aloft is present below:

(2) The highest instrument minimum applicable to the airfield and no sky cover was reported below this height in the previous R, S, or RS observation.

(c) Visibility. Prevailing visibility (rounded to reportable values) decreases to less than, or if below, increases to equal or exceed:

(4) 1 mile

(5) All nationally published minima, applicable to the airport, listed in the NOS instrument Approach Procedure Charts.

(6) Values established locally because of their significance to aircraft operations.

CHAPTER A–6.

" * * *

3.11 Control Tower Observations and Actions. Unless otherwise exempted, certified, or otherwise authorized Tower personnel shall report prevailing visibility when the prevailing visibility at the usual point of observation or at the tower level is less than 4 miles. (These Control Tower visibility observations may be used immediately for aircraft operations but they shall be recorded and forwarded to the weather station as soon as practicable.)

Returning to the facts in the case, the Court concludes from the record, including stipulation by the parties, that there are numerous pertinent facts which are undisputed. Thus, the Court finds the following facts admitted or undisputed:

1. At all relevant times the communications by Little Rock Approach Control to 44JG were conducted by Javier Ferdinand Espejo, an army enlisted trainee being cross-trained and supervised by the Federal Aviation Administration. Espejo worked under the supervision of a journeyman Controller;

2. At all relevant times the communications by Pine Bluff Tower to N44JG were conducted by John Michael Ray, a controller-trainee with approximately one month's experience, under the supervision of Rolland Downhour whose duty and responsibility was to monitor the communications and immediately correct any mistakes. Both Ray and Downhour were employed by the Federal Aviation Administration;

3. All acts or omissions of Mr. Espejo, Mr. Ray and Mr. Downhour are imputed to the United States;

4. Jerry Allison was an employee of Ragsdale Aviation, Inc. at the time of the accident acting within the course and scope of his employment;

5. Ben Martin was an employee of Logicon, Inc. at the time of the accident acting within the course and scope of his employment;

6. On the first attempt to land the plane at the Pine Bluff Airport, Little Rock Approach Control told 44JG, at approximately 6:55 p.m. to expect a VOR approach to Runway 17 to Grider Field and was advised that the Pine Bluff weather was measured ceiling 300′ overcast, visibility one mile, light drizzle and fog, wind 120 at 5 knots, altimeter 29.80;

7. At 7:08 p.m., 44JG was cleared by Little Rock Approach for a VOR approach to Runway 17;

8. At 7:12 p.m. 44JG asked Pine Bluff Tower the altitude at which a preceding plane had "broken out" on its approach, indicating a concern on the part of 44JG as to the existing ceiling;

9. At 7:16 p.m., just after 44JG declared a missed approach, (failed to see runway lights in time to land) Little Rock Approach Control cleared 44JG for a second approach and advised the weather was the same, measured 300′ overcast, visibility one mile, drizzle and fog, wind 120 at 5 knots, altimeter 29.80;

10. Immediately following the above weather transmission to 44JG by Little Rock Approach, Pine Bluff Controller told Little Rock Approach that he was going "to come out with some special weather." Little Rock Approach asked if it would be better or worse. Pine Bluff Tower advised "worse, lower visibility." This discussion regarding updated and worsening weather at Pine Bluff between FAA Controllers at Pine Bluff and Little Rock was on a land line and could not be heard on board 44JG, which was at that time preparing for its second approach *on this dark night* in poor weather;

11. Despite the fact that less than one minute before, Little Rock Approach had given 44JG a measured 300′ ceiling and one mile visibility (weather which was taken at 6:45 p.m. Observation), Little Rock Approach made no effort to alert 44JG to the fact that Pine Bluff was coming out with special weather which would be worse, including lower visibility. From 7:16 p.m. to 7:21 p.m., 44JG was under the control of Little Rock Approach, on its frequency, and in receipt of two separate communications, one at 7:17 p.m. and one at 7:21 p.m. If 44JG had been apprised by Little Rock Approach that special weather was forthcoming which would be worse, including lower visibility, it is most likely that this second approach would not have been attempted by 44JG until completion of the special weather; and

12. At 7:21 p.m., Pine Bluff Tower assumed control of 44JG and transmitted only the following weather information, "*wind calm, altimeter 29.90, report the VOR inbound.*"

From the record, including the testimony of the expert witnesses and inferences from proven facts, the Court is of the opinion that when the Controller at the Pine Bluff Tower gave the acknowledged erroneous report "altimeter 29.90" the pilots of 44JG adjusted the altimeters accordingly. These altimeter settings caused the pilots to believe the plane was 100′ higher than its actual altitude above the ground.

The government contends that the failure to give timely weather information and the erroneous altimeter setting, 29.90, were not a proximate cause of the accident. The plaintiffs contend that the undisputed testimony of Mr. Parnell and the government witness, Mr. Rowan, leads to the inescapable conclusion that no approach would have been made if the timely and correct information had been relayed to the pilots. Mr. Parnell, plaintiffs' expert witness, testified that 999 of 1,000 pilots would not have attempted an approach under the weather conditions which existed at that time. These conditions were not communicated to the pilots.

■ The Court concludes that the failure of Little Rock Approach to apprise 44JG that the weather given at 7:16 p. m. was no longer current or accurate and the additional failure to warn 44JG of the impending special weather observation were acts of negligence which were a proximate cause of the airplane crash.

■ The Court further concludes that the failure of the Pine Bluff Controller to warn 44JG that the previously reported weather was no longer current or accurate and the additional failure to warn 44JG of the impending special weather report were acts of negligence by the Trainee-Controller communicating to the airplane and a proximate cause of the tragic accident that followed.

■ Furthermore, the failure of Mr. Downhour, Supervisor of the Trainee-Controller, to detect and correct the errors of omission and commission on the part of the Trainee was a proximate cause of the crash.

■ No later than 7:23 p. m., and possibly before, the Pine Bluff Trainee-Controller completed the entire special weather observation, which included a significant

deterioration in the weather previously transmitted to 44JG. This special weather observation included a *zero ceiling and ¾ mile visibility with drizzle and fog.* The Controller failed to immediately transmit this information to 44JG. At approximately 7:25 p. m., the Pine Bluff Controller transmitted to "Twin Cessna 44 juliet golf" new Pine Bluff visibility ¾ mile with light drizzle and fog. 44JG acknowledged the information. This transmission omitted essential elements in the special weather observation, namely, the existence of zero ceiling, or sky obscured, and failed to correct the previous erroneous altimeter setting of 29.90. The failure to immediately convey this special weather observation was negligence which was a proximate cause of the airplane crash.

Due to the fact that this information was not immediately transmitted, the pilots of 44JG had reason to believe the ceiling continued to be 300'. This vital information with respect to the ceiling was withheld from the Twin Cessna 44JG despite the fact that the plane had previously expressed grave concern as to the height of the ceiling. This omission was negligence which was a proximate cause of the fatal crash.

At 7:26:23, 44JG reported over the VOR. At 7:26:27, four seconds later, Pine Bluff Controller reported to 44JG, "Twin Cessna 44 juliet golf, roger, check wheels down, cleared to land, new Pine Bluff weather, indefinite ceiling, sky obscured, visibility three-quarters, drizzle and fog, wind calm, *altimeter two niner eight zero.*

44JG did *not* acknowledge this report.

From this record, including the testimony of expert witnesses, the Court has no difficulty in determining that this last report by the FAA Controller at the Pine Bluff Tower was *not* received by 44JG or, if it was received, it was not received in sufficient time to be of any benefit or value to the pilot.

If this complete special weather observation by the Controller, made at or before

7:23 p. m., and recorded at 7:25 p. m., indicating deterioration of the weather, had been received by the pilot in time, prior to the crash, no landing would have been undertaken. It is only reasonable to conclude that the pilot, with the experience of an acknowledged certified pilot, and in view of the knowledge obtained from the first approach, would have immediately determined that a successful VOR instrument approach and landing could not be made.

The airport at Memphis, Tennessee, is located approximately 100 miles from Grider Field. At 6:30 p. m., 44JG had stated to the Flight Service Station at Greenwood, Mississippi, that it would attempt one approach at Pine Bluff and, if it could not get in there, the flight would go on to Memphis, Tennessee. The weather at Memphis, known to 44JG, was 1800' scattered, 3,300' overcast, visibility 10 miles. The Memphis airport was equipped with radar and more precise landing facilities than was Pine Bluff. If the pilot of 44JG had known the weather, as it was observed at or before 7:23 p. m. at Grider Field, it is only reasonable to conclude that the pilot would not have attempted the second approach and landing, but would have diverted the flight to the alternate airport at Memphis.

On the crucial issue of the altimeter setting, the government contends that the pilots never dialed the erroneous setting. Further, it is the government's position that if the pilots adjusted the altimeter to the erroneous setting of 29.90, as reported to 44JG at 7:21 p. m. by the Pine Bluff Tower, the pilots had ample time to reset the altimeter to the correct setting with the weather observation given to the pilots at 7:26:27 p. m. The crux of this issue is the approximate location of the plane when it reported over VOR at 7:26:23 p. m. While the testimony is conflicting, the overwhelming preponderance of the testimony negates the contention of the government. In order to determine the approach glide and landing attitude of 44JG, the expert witness for the plaintiffs presented an exhibit and explained the flight of the aircraft on the two

approaches.[2] From the tape recordings of the conversations, which are precisely timed by frequent time signals therein, the exact time of transmissions between the aircraft and the controllers may be established. The speed of the aircraft on an approach is known within very narrow limits. The probable location of the aircraft could then be calculated mathematically, backward and forward from known positions.

From a transmission of 44JG at 7:09:15 his position at that time, according to the indication on the DME, was three nautical miles North of the VOR. Calculating from that point with speed and time, the witness placed 44JG over the VOR at 7:11 and at a point 1.8 miles past the VOR, halfway to the threshold of runway 17, when 44JG reported "over VOR" at 7:12. Only 1 minute later, at 7:13, 44JG reported that it had missed the approach. A later transmission indicated that the missed approach was because 44JG had seen the lights of the runway too late to make a normal landing. This indicated to the witness that the transmission at 7:13 was made at a point very near the approach end of runway 17. There would seem to be a verification of both ends of the line of the approach as described and drawn in detail by Mr. Parnell.

After 44JG reported that it had missed the first approach, Little Rock Approach Control advised that the weather was the same, and repeated the weather as given in the 6:55 transmission. 44JG was then cleared for a second approach, VOR runway 17, proceeded to a point some five nautical miles North of the VOR and made a "procedure turn" toward the VOR. Neither controller advised 44JG of the information Ray had given Espejo over the telephone, that the visibility had become worse.

■ Pine Bluff Tower resumed control of 44JG and at 7:21 controller Ray transmitted a report of "wind calm, altimeter 29.90". The United States admits that this altimeter setting was erroneous and the evidence established that such an error would result

in the altimeter indicating the aircraft to be some 100' higher than it in fact was. From a preponderance of the evidence, the Court finds that the erroneous altimeter setting was in fact dialed into the altimeters aboard 44JG by the pilots in reliance upon the information supplied by the Pine Bluff FAA Tower. The error was not noted and corrected by the supervising controller, Mr. Downhour.

44JG was directed to report over the VOR inbound on the second approach. According to the coordination with the plat of the first approach and known positions at known times, Mr. Parnell calculated that 44JG was over the VOR at approximately 7:25 and that, when 44JG reported "over the VOR" at 7:26:23, it was approximately 2 nautical miles past the VOR. The delay in reporting VOR passage was explained by the witness as due to waiting for a clear indication from the instrument of passage of the station and due to the preoccupation of both pilots with preparing the aircraft for landing and setting up and establishing the aircraft on the precise glidepath necessary to a VOR instrument approach.

At the time 44JG reported over the VOR, some two nautical miles past the VOR, it was within some 5/10 nautical miles of the place where it crashed. At approach speed, this distance would have been covered in approximately 20 seconds. Only after the 7:26:23 report of 44JG did controller Ray transmit the new weather observation including the correct altimeter setting and the new information that the ceiling was not measurable, that the ceiling was no longer 300'. This transmission lasted for 15 seconds. The Court concludes that the information was not received by 44JG in time to be acted upon before the crash.

The United States contends that the erroneous altimeter setting of 29.90 was so drastic a change that it was obviously erroneous, and that the pilots should have ignored it. For this reason, the Government contends that the pilots of 44JG did not dial

**2.** The approach plate (Plaintiff's exhibit 6) and the plats of the first and second approach paths from calculations of Mr. Parnell (Plaintiff's ex-

hibits 8 and 9) are here reproduced for a better understanding of his testimony.

the erroneous setting into their altimeters. The testimony established that controller Downhour, whose duty it was to monitor the observations and transmissions of trainee controller Ray, did not notice this error. The record of the transmissions of the flight as it progressed from New Orleans contained changes in altimeter settings, such as 28.85 at Jackson, Mississippi. Reliance on such reports and immediate compliance with altimeter settings is such, according to the evidence, as to make the response of general aviation pilots virtually automatic. The Court has no hesitancy in concluding that the erroneous altimeter setting was in fact dialed into the instruments on 44JG, and that such action on the part of the pilots, relying upon the observations of the controller, was not in any way negligent.

The Government further contends that the pilot of the aircraft, either Martin or Allison, descended below the Minimum Descent Altitude (MDA) established for a VOR Runway 17 instrument approach to Grider Field. As established, that altitude is 580′ MSL. The approach plate for this approach which is reproduced herein, Plaintiff's exhibit 6, shows that the elevation of the terrain on the approach to Grider Field is 206′ MSL. The MDA would thus be some 374′ above ground level. As 44JG impacted the ground, there is no doubt that it did descend below the MDA.

The question is, therefore, whether the person having control of 44JG was in violation of 14 C.F.R. § 91.117 at the time the plane descended below the MDA or from such descent until the impact. A further question is whether one or both of the pilots were negligent in descending below the MDA.

From the prior findings of the Court, with the erroneous altimeter setting the plane would have been at a true height of some 480′ MSL or 274′ AGL when the altimeters were indicating that 44JG was at

the MDA of 580′. Thus, the initial actual descent below MDA was due to the negligence of the controllers and was unknown to the pilots.

The Court presumes that the two experienced pilots aboard 44JG would have obeyed the regulation, which had the force and effect of law. The possible sanctions for violation of the regulation would pale in comparison with the instinct for self-preservation, which would also motivate the pilots not to descend below the MDA without being in compliance with the regulation requiring visual contact.

From all of the evidence, the Court finds that the pilot in control of 44JG did have in sight lights [3] which were at the approach end of Runway 17 and that he then believed that he was in a position from which a normal landing might be made. However, the Court finds that, due to the fact that the plane was some 100′ lower than he believed it to be, the unlighted fog-enshrouded trees below, the indefinite ceiling above, he became somewhat spatially disoriented in making the transition from flying in reliance on instruments to flying with reference to the lights which he observed emanating from between the clouds and the ground fog.

He was, the Court concludes, in visual contact with the strobe lights at the Runway 17 threshold and in what appeared to him to be a position to land the aircraft when he went below what his altimeter erroneously indicated was the MDA. The pilot was further under the erroneous impression that the weather, as observed by the Pine Bluff Tower, remained a 300′ measured ceiling. Controllers Ray and Downhour had known for at least three minutes that the ceiling was indefinite, sky obscured, with no measurable base to the overcast, but failed to communicate this information to 44JG.

3. The "strobe" lights which were at the approach end of the Runway are flashing, high intensity lights which can be seen at a much greater distance than the 60 watt bulb used by the controllers to determine visibility from the tower. Further, under the conditions then existing, slant visibility from the aircraft would have been much greater than visibility from the tower level.

■ A descent at a rate of approximately 500' per minute from an altitude of 274' above ground level, would result in encountering a tree 60' in height after a loss of altitude of only some 214', only some 26 seconds after descending below what was indicated on the altimeter as the MDA. The Court, therefore, concludes that the Government has failed to bear its burden of establishing by a preponderance of the evidence that the pilots, or either of them, of 44JG, were negligent in descending below the MDA.

■ The Court finds and concludes that the negligence of the air traffic controllers, Ray and Downhour, in failing to give to the pilots of 44JG current weather observations known to them as soon as reasonably possible and in giving and permitting to be given to the pilots an erroneous barometric altimeter setting was a proximate cause of the crash of 44JG, its loss, and the deaths of those aboard.

■ In *Yates v. U. S.,* 497 F.2d 878 (10 Cir. 1974), the Court noted that the pilot of an aircraft is entitled to rely upon the information and directions supplied by air traffic controllers and is not free, or expected to, disregard such information and directions. The Court said:

> "It is familiar law that one in the care and custody of another where the circumstances deprive the person of an ordinary opportunity to protect himself has a right to expect that the person exercising the custody shall use reasonable care and caution for his protection. See Restatement of Torts Second, §§ 314 and 320. . . It has long been recognized, however, that negligent discharge of responsibilities in situations like the present one can result in federal government liability under the Federal Tort Claims Act. See *Indian Towing Co. v. United States,* 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955). In this case there was a negligent failure to tend a lighthouse, whereby it was held that where the government undertakes to warn of danger and thereby induces reliance, it is subject to liability for failure to discharge its duty. Similarly, the deci-

sion to operate air control towers and maintain air traffic separation is a legislative one and negligent operation of the facilities subjects the United States to liability." Citing Cases.

■ The government contends that the pilot of 44JG was negligent in failing to report immediately as the plane went over VOR and by descending below the MDA in violation of the regulations. Such negligence, it is urged by the government, contributed to the plane striking the trees and, subsequently, crashing causing the damage and fatal injuries. With this contention the Court cannot agree. Contributory negligence under Arkansas law may be a complete bar or considered in mitigation of damages. In this case, the contention of the government is based wholly on unsupported facts. There is no showing in the record that the pilot failed to observe correct procedures with the information which had been provided to him by the Controllers, as he was in a landing attitude in the belief that he was 100' higher than he actually was and that the ceiling was approximately 300'. It is, therefore, the opinion of the Court that there is no basis for determining, under the circumstances, that the pilot was guilty of contributory negligence. See Yates, supra, pp. 884, 885.

■ Although this case is brought pursuant to the provisions of the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671, et seq., the law of the place where the act or omission occurred is applicable. In this case, therefore, Arkansas law applies. 28 U.S.C. § 1346(b), *Richards v. United States,* 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962).

■ It is well settled that the United States can be held liable under the Federal Tort Claims Act for the negligence of its air traffic control personnel, *United States v. Union Trust Co.,* 350 U.S. 907, 76 S.Ct. 192, 100 L.Ed. 799 (1955), affirming 95 U.S.App. D.C. 189, 221 F.2d 62 (1955); *Yates v. United States,* 370 F.Supp. 1088, D.C., affirmed 497 F.2d 878 (10th Cir. 1974); *Stork v. United States,* 278 F.Supp. 869 (S.D.Cal.

1967), affirmed 430 F.2d 1104 (9th Cir. 1970); *Hartz v. United States,* 387 F.2d 870 (5th Cir. 1968); *Furumizo v. United States,* 245 F.Supp. 981 (D.Hawaii, 1965), affirmed per curiam, 381 F.2d 965 (9th Cir. 1967).

The Court further concludes that the plaintiffs have sustained their burden of proving by a preponderance of the evidence that the FAA air traffic controllers of the Little Rock Approach Control and Pine Bluff Tower were negligent, and that such negligence was a proximate cause of the fatalities and loss of the aircraft in the accident.

■ The Court further concludes that the defendant has failed to sustain its burden of establishing by a preponderance of the evidence that the pilot or pilots of N44JG were negligent in the operation of the aircraft, and that such negligence was a proximate cause of the accident. A party who asserts the defense of negligence chargeable to a person claiming damages has the burden of proving such defense. Arkansas Model Jury Instructions, No. 206, and cases cited thereunder.

Further, even had negligence on the part of the person in control of the aircraft been established, the defendant failed to establish by a preponderance of the evidence which of the virtually equally qualified pilots occupying the front seats of N44JG was actually in control of the aircraft at the time such alleged act or acts of negligence occurred.[4] The aircraft was equipped with dual flight controls and dual flight instruments, so that it could be flown equally well from either of the two front seats. From the evidence, one of the pilots might well, in the usual and ordinary course of an instrument approach with two pilots aboard, have been charged with the monitoring of the instruments and the other assigned to looking outside the aircraft for lights or other ground contact. The person looking outside might well be ignorant of, and not have any responsibility to monitor, the altimeter reading. Such a division of responsibility is, according to the testimony, usual.

■ The identity of the person actually in control of the dual control aircraft not having been established, and there being circumstances under which the pilot not in control may well have been exercising due care in the performance of the duties assigned to him without any duty to monitor the altimeter and thus to even be aware that the person in control had descended below the MDA, it would be grossly unfair for this Court to engage in speculation and conjecture to charge either with negligence. In cases where it has been sought to determine negligence on the part of pilots of dual control aircraft, there are numerous decisions supporting the ruling that such speculation will not be engaged in, with fact situations much more suggestive as to which of the pilots was in control than are found here. See *Mitchell v. Eyre,* 190 Neb. 182, 206 N.W.2d 839 (1973); *Udseth v. United States,* 530 F.2d 860 (10 Cir. 1976); *Morrison v. LeTourneau Co.,* 138 F.2d 339 (5 Cir. 1943); *Hall v. Payne,* 189 Va. 140, 52 S.E.2d 76 (1949); *In re Rivers Estate,* 175 Kan. 809, 267 P.2d 506 (1954); *In re Hayden's Estate,* 174 Kan. 140, 254 P.2d 813 (1953); *Towle v. Phillips,* 180 Tenn. 121, 172 S.W.2d 806 (1943); *Budgett v. Soo Skyways, Inc.,* 64 S.D. 243, 266 N.W. 253 (1936) and *Michigan Aero Space Club v. Shelley,* 283 Mich. 401, 278 N.W. 121 (1938).

In view of the Court's conclusions on the basis of the findings, as set forth hereinabove, the claim of the United States for contribution from Logicon and Ragsdale Aviation must be denied and dismissed.

The claim of negligence on the part of the United States having been established by a preponderance of the evidence on behalf of the plaintiffs, judgment will be entered on behalf of the plaintiffs against the United States of America in such amounts of damages to be assessed pursuant to findings in a separate memorandum.

Appendix to follow.

4. The parties stipulated no determination could be made as to who was piloting the aircraft. t.

PLAINTIFF'S
EXHIBIT
6

Amdt 13

# VOR RWY 17

AL-901 (FAA)

**GRIDER FIELD**
PINE BLUFF, ARKANSAS

LITTLE ROCK APP CON
041°-220° 124.2 353.6
221°-040° 119.5 306.2
PINE BLUFF TOWER★
118.4
GND CON
121.8

PINE BLUFF
116.0 PBF
Chan 107

Final approach from PBF VORTAC
holding pattern not authorized,
procedure turn required.

RISON

MONTICELLO
111.6 MON
Chan 53

FEEDER FACILITIES

ENROUTE FACILITIES

MISSED APPROACH
Climb to 2000 via PBF
VORTAC R-209 to Rison
Int and hold.

VORTAC

Remain
within 10 NM

360°

1800

180°

181°✶ 1200

3.9 NM

ELEV 206

181° 3.9 NM
from VORTAC
243

Elev.
206

261★

233

1974 x 135

5100 x 150

35

238

HIRL Rwy 17-35
REIL Rwy 17

FAF to MAP 3.9 NM

| Category | A | B | C | D |
|---|---|---|---|---|
| S-17 | 580-¾ 374 (400-¾) | | | 580-1 374 (400-1) |
| CIRCLING | 600-1 394 (400-1) | 660-1 454 (500-1) | 660-1½ 454 (500-1½) | 760-2 554 (600-2) |

When control zone not effective operators without approved weather service:
1. Use Little Rock, Arkansas altimeter setting. 2. Increase circling and straight-in
MDA's 140 feet. 3. Increase straight-in visibility CAT D to 1¼ miles. 4. Alternate
minimums not applicable.

| Knots | 60 | 90 | 120 | 150 | 180 |
|---|---|---|---|---|---|
| Min:Sec | 3:54 | 2:36 | 1:57 | 1:34 | 1:18 |

# VOR RWY 17

8 AUG. 1974

34°11'N-91°56'W

PUBLISHED BY NOS, NOAA, TO IACC SPECIFICATIONS

PINE BLUFF, ARKANSAS
**GRIDER FIELD**

N 44 JG

First Approach

A • 7:09:15 Known

3 nm or 1 min 45 sec

B △ VOR 7:11

1.8 nm or 1 minute

C • Actual Position when 7:12
Reported over VOR

1.8 nm or 1 minute

D □ Missed Approach Point 7:13

PLAINTIFF'S
EXHIBIT
8
PB.25-C-14, etc

N 445 G

Second Approach.

A △ VOR Approx 7:25

Approx 2 nm

B • Reported Over VOR 7:26:23

C • Crash Sight — Just a few
Seconds after Report "Over VOR."

PLAINTIFF'S
EXHIBIT
9

## MEMORANDUM OPINION
## ON DAMAGES

In a separate memorandum opinion, as to these consolidated cases, the Court made a determination from its findings of fact and conclusions of law that the claim of negligence on the part of the United States of America was established by a preponderance of the evidence on behalf of the plaintiffs. Having reached that decision on the issue of liability in favor of the plaintiffs and against the defendant, United States of America, the Court, in this separate opinion, now undertakes a determination of awards to the plaintiffs, in the form of damages, which each of the party-plaintiffs is entitled to recover from the defendant. The Court has the benefit of ore tenus testimony, as applicable to each of the claimants, including the testimony of expert witnesses, exhibits, excellent briefs by counsel for each of the parties and the entire record of these consolidated cases.

In that the parties had settled the respective claims filed in separate litigation with respect to liability against such parties except the United States of America, as announced to the Court at the outset of the trial, the total awards determined by the Court with respect to each claimant will be reduced by the amounts the claimant received in the respective settlements. The attorneys for the respective claimants have agreed that such awards be reduced pursuant to the Uniform Contribution Among Tortfeasors Act, as provided by Ark.Stats. Anno. § 34–1001, et seq.

The Court has already made its findings and concluded that Arkansas law is applicable. In this wrongful death action, the measure of damages is established (A.M.I. 2215). The elements of damages in a proceeding brought by the administrator of the estate of a deceased are as follows:

(a) Pecuniary injuries sustained by spouse and statutory beneficiaries entitled to recover for pecuniary injuries;
(b) Mental anguish suffered by spouse and statutory beneficiaries making claims; and
(c) Loss of consortium of spouse.

The term "pecuniary injuries" refers to the present value of benefits, including money, goods, and services the deceased would have contributed to the claimed beneficiaries had he lived. In reaching a determination of pecuniary injuries, consideration may be given to the following factors concerning the deceased:

(a) What he customarily contributed in the past and what he might reasonably have been expected to contribute had he lived;
(b) The period during which any beneficiary might reasonably expect to have received contributions from the deceased;
(c) What the deceased earned and what he might reasonably have been expected to earn in the future;
(d) What he spent for customary personal expenses and other deductions;
(e) What instruction, moral training, and supervision of education he might reasonably have given the children had he lived;
(f) His health;
(g) His habits of industry, sobriety, and thrift;
(h) His occupation;
(i) The life expectancy of the deceased and of the spouse; and
(j) The time which will elapse before each child reaches majority.

The term mental anguish means the mental suffering resulting from emotions such as grief and despair. It must be real and with cause and be more than the normal grief occasioned by the loss of a loved one.

The term "consortium" refers to the society, services, companionship, and marriage relationship of the spouse.

The administrator may also claim damages on behalf of the estate and the following element of damage may be considered:

(a) The reasonable value of funeral expenses.

Applying the above stated elements of damage, the Court now proceeds to a determination of damages to each of the plaintiffs, i. e., surviving wife and children, from the evidence presented as to each

claimant. In making a determination as to each of the plaintiffs, appropriate mortality tables, as presented in evidence, will be considered as the average life expectancy of the deceased persons. Furthermore, using the term "present value" of benefits with respect to certain elements of damage, consideration will be given by the Court that money recovered will earn interest, if invested, until the time in the future when these losses will actually occur. Therefore, damages determined by the Court as an award to compensate for the loss of future contributions, after the date of the award, will be reduced accordingly.

## DAMAGES OF MRS. CARLENE ARNOLD SMITH AND THEIR SON, STEVEN

Marvin Smith was 41 years of age at the time of the tragedy, December 6, 1974, resulting in his death. He and the plaintiff, Carlene Arnold Smith, had enjoyed their only marriage for 19 years. Their only child, Steven Lee Smith, was 18 years of age at the time of his father's sudden death.

The two survivors, Mrs. Carlene Arnold Smith and Steven Lee Smith, bring their action as individual plaintiffs, no administrator having been appointed.

Mr. Smith had a life expectancy at the time of his death of 30 years pursuant to the provisions of Ark.Stat. § 50–705. Dr. Duggar, an expert witness who qualified as an expert on economics, testified on behalf of the Smiths and stated that Marvin Smith, at the time of his death, had a "work life expectancy" of 21 years. The Court has carefully reviewed the testimony, exhibits and the record presented as to the economic effects of the death of Mr. Smith upon his survivors. From the ore tenus testimony and other evidence, including the testimony of expert witnesses, the Court makes the following findings of fact:

At the time of his death, Mr. Smith had an annual income of approximately $30,-000.00. From the records available in the case, the Court concludes that there would have been an approximate tax liability of 20%, $6,000.00. The record further discloses that Mr. Smith would have received fringe benefits which the Court finds would have increased his ability to make contributions to his family by some $3,000.00 and that he would have expended for personal consumption approximately $4,500.00. From these findings, the Court concludes that Mr. Smith's initial annual contributions to his family would have been approximately $22,-500.00.

From the testimony of the expert witness and the past earnings records, it is reasonable to find that Mr. Smith would have had an average of 5.5% increase annually in such amounts available for contributions. Furthermore, from the testimony of all the expert witnesses, the Court finds that a yield rate of 6% on absolutely safe investments, such as U.S. Treasury Notes and Bonds, may be anticipated as available to investors, and that this rate should be applied as the factor for reducing the amounts of future contributions to present value where such reductions may be hereinafter found to be proper.

In considering the fact that three years have passed from the date of Mr. Smith's death to the date of this award, his survivors are entitled to such three years contributions without discount to "present value". Applying the 5.5% rate of increase in contributions, the total of contributions that Mr. Smith would have made to his survivors during the three year period would amount to $71,280.00.

During such three year period, the Court finds from the evidence presented in the case, that Steven would have been enrolled full time as a college student and would have received contributions in a total amount of $12,000.00. When this amount is deducted from the total of contributions for the three years between the date of death and the award, the Court concludes that the balance of $59,280.00 would have been received by the widow, Mrs. Carlene Arnold Smith.

From the testimony and evidence, the Court finds that, in consideration of the

"work life expectancies" ascribed to the other parties, the age, occupation, health and habits of Mr. Smith, and the testimony of the expert witness, Dr. Duggar, it would be reasonable to expect that Mr. Smith had a "work life expectancy" of 25 years at the time of his death. The three years which have passed since the death have previously been provided for. Future contributions will, then, be calculated on the basis of a remaining 22 years of work life expectancy.

 Applying the 5.5% anticipated annual increase in the amount of contributions, the total of future contributions over the 22 years of remaining work life expectancy would be a rounded figure of $1,079,-600.00. Applying the selected rate of 6% to reduce this amount to its present value [1] yields the amount of $522,000.00 as the rounded present value of future contributions. The Court finds that all of these future contributions would have been made to his widow.

 The son, Steven, being 18 years of age at the time of his father's death, lost only a few years of parental moral and educational supervision. He did experience more than the usual mental anguish which would be anticipated from the death of a loved one, due to the close relationship with his father and the manner and untimeliness of his father's death. The Court is of the opinion that the amount of $7,000.00 would be fair and reasonable compensation for such mental anguish and loss of parental guidance.

 Mrs. Carlene Arnold Smith has lost an anticipated 30 years of close companionship, services and society of her husband. The evidence is undisputed that their relationship was close and affectionate. They had only one child, who was leaving the home. From the evidence, the Court finds that an award to Mrs. Smith for loss of consortium in the amount of $45,000.00 is justified.

 The Court finds that she suffered unusual grief and mental anguish due to the closeness of the relationship with her husband, the manner and untimeliness of his death, and being left alone for the first time in some 19 years. The circumstances of the death of each of the four victims was a source of extraordinary mental anguish, their deaths occurring suddenly, without warning, their bodies being virtually consumed by fire. The Court is of the opinion that Mrs. Carlene Arnold Smith is entitled to an award of $20,000.00 for such extraordinary mental anguish.

 No award for the plaintiffs Smith can be made for the funeral expenses in the absence of an administration. See *McCormick v. Sexton,* 239 Ark. 29, 386 S.W.2d 930 (1965).

The Court, therefore, finds that Mrs. Carlene Arnold Smith is entitled to judgment herein in the total amount of $646,280.00 and that Steven Lee Smith is entitled to judgment in the amount of $19,000.00 as compensation for the wrongful death of Marvin Smith.

### DAMAGES OF MRS. GEORGIA G. HENDRICKSON AND THREE CHILDREN

At the time of the fatal accident, on December 6, 1974, Homer Hendrickson was 50 years of age. He and the plaintiff, Mrs. Georgia G. Hendrickson, Administratrix of the Estate of Homer Hendrickson, deceased, married March 16, 1949, and enjoyed a very fine marriage for a period of 25 years. They were blessed with three children, namely, Philip—age 21, Emily Christine—age 20, and Ann Elizabeth—age 18. All three of the children were enrolled and attending college at that time.

Homer Hendrickson had a life expectancy of 23 years, pursuant to Ark.Stat. § 50–705, and as testified by the expert witness Dr. Ralls. Mr. Hendrickson was a graduate of the University of Missouri School of Journalism and had an excellent background as a newspaper man. In his earlier profession-

1. Source: Table at p. 65, Economic Damage Calculator, Criterion Analysis, Inc., (1977), utilized in determining gross and present values of future contributions.

al life, he was the Marine and Waterfront Editor of the nationally well-known newspaper, the Cleveland Plain Dealer. In 1962, he was employed by the American Waterways Operators, Inc., a trade association representing carriers operating on the inland and intercoastal waterways. His salary at the time he went to work for AWO was $11,000.00. He had advanced in his employment and, at the time of his death, he was Director of Public Relations and Executive Assistant to the President of AWO. His salary with the organization had tripled and, on January 1, 1975, less than a month after his tragic death, would have been $33,000.00 a year. His salary for the year of 1973 was approximately $31,713.00.

The expert witness, Dr. Ralls, testified that, considering the profession of Mr. Hendrickson, the nature of his employment, his health and industry, his work life expectancy would, in all probability, have coincided with his life expectancy of 23 years. Mr. Carr, president of AWO for many years, and recently retired, testified at some length as to the exceptional ability of Mr. Hendrickson for this particular work and his unique value to the organization, AWO. It is quite likely that, with the increased activity by the water carriers, the American Waterways Operators, Inc., is and will continue to be a viable and active organization. Mr. Carr was confident that Mr. Hendrickson would have been continued in his employment and remained active for the remainder of his life.

The Court had the benefit of substantial ore tenus testimony, exhibits and well prepared briefs of counsel. His past salary increases were reviewed by witnesses, including the expert witness on economics. The Court has considered this record as to his background, habits, earnings and projected earnings, the personal consumption of Mr. Hendrickson, fringe benefits and other factors, including income tax liability, and the base salary of the deceased, which was to become effective January 1, following his death, of $33,000.00.

From this base salary, the court concludes that a probable income tax liability would be due and that a rate of 20%, $6,600.00, would be fair and reasonable. From the record, his personal consumption should be established at a rate of some $3,500.00 per year. Considering that in his employment he enjoyed an expense allowance and extensive travel compensated by his employer, contributions for insurance, etc. . . ., the Court is of the opinion that the evidence justifies fringe benefits that should be added in an amount of approximately $2,500.00 per year. This would result in an annual amount available for contribution to his survivors of approximately $25,400.00.

From the testimony of expert witnesses, it is reasonable to assume that Mr. Hendrickson would have enjoyed increased earnings of approximately 6% per year during his life expectancy. Furthermore, from the record presented to the court, and that utilized in similar proceedings, the court finds that a discount rate of 6% would be a fair and reasonable factor to be applied in reducing to present value the total sum of contributions which the survivors would have received in the future. (Dr. Ralls, plaintiff's expert witness, applied in his computation a discount rate of 7½% in reducing the total figure to its present value).

In considering the fact that 3 years passed from the date of Mr. Hendrickson's death to the date of award, his survivors are entitled to 3 years' earnings without discount. Applying the 6% rate of increased earnings the total contributions he would have made to his survivors for those 3 years would be $80,860.00. Considering the ages of the survivors and the expected contributions of the deceased to the children and to his widow, the court concludes that his son Philip should receive the sum of $9,000.00; his daughter Emily Christine should receive a similar amount of $9,000.00, and his daughter Ann Elizabeth should receive $9,000.00. Reducing the total anticipated contributions for the 3 years by these amounts leaves a balance of $53,860.00 as contributions for Mrs. Georgia G. Hendrickson for those 3 years.

█ Assuming the future contributions, after the date of the award, would have continued over a period of 20 years (the 23 year life expectancy less the 3 years between the death and the award), using the contributions of $25,400.00 to the survivors as a beginning base in the year 1975, and assuming a 6% annual average increase in such contributions, the total of such future contributions would result in a rounded figure of $1,419,745.00. Applying the 6% discount rate in reducing the total future contributions to present value,[2] to allow for the reasonable earning power of such amount being received now rather than over a period of years in the future, would result in a present value of such sum of $655,500.00.

In consideration of the ages of the 3 children and their educational attainments, of these future contributions Philip would probably have received nothing; Emily Christine, the older daughter, would have received approximately $3,000.00 and the youngest daughter, Ann Elizabeth, would have received approximately $5,000.00. The Court further concludes that the balance of the future contributions in the amount of $647,500.00 would have been contributed to his widow.

As already stated herein, the three children surviving Mr. Hendrickson were students in college at the time of his death. It is well established from the testimony that this was a very close-knit family. It was the first and only marriage for Mr. and Mrs. Hendrickson. Mr. Hendrickson was described as "an ideal husband". Almost all of his time away from his work was spent with his wife and children. He assisted the children in their school work, their hobbies and career interests. However, for practical purposes, the children had already received most of the supervision and training which would have been provided for them. It would naturally follow that they experienced mental anguish to a much lesser extent than did their mother.

█ From the evidence, it is established that Mrs. Hendrickson took the death of her husband exceptionally hard. She was compelled to leave her employment; she lost a great deal of weight; her health was direly affected by her mental anguish over the untimely, unanticipated and gruesome manner of his death. Mental anguish will vary in every case with the nervous temperament of the individual, the ability to withstand shock, circumstances of the death and innumerable other factors. Mrs. Hendrickson suffered sleeplessness or troubled sleep over an extended period, obvious extreme or unusual nervous reaction to her great loss, crying spells over an extended period of time and loss of weight, as well as other physical symptoms. Cf. *St. Louis Southwestern Railway Co. v. Pennington*, 553 S.W.2d 436, 446–450 (Ark.1977). The Court concludes that she should be awarded the sum of $30,000.00 in that she has suffered much more than the usual and expected mental anguish in the aftermath of the tragedy.

█ It is established by the record that each of the three children suffered mental anguish more than the usual or normal grief and should be awarded a sum of $7,000.00 each for the loss of such supervision that would have been received, together with their mental anguish.

█ It is also established by the record that Mrs. Hendrickson has been deprived of and lost the anticipation of some 20 years of companionship, society, services and the other factors which are referred to as marital consortium. The Court finds that an award to her in the amount of $35,000.00 is just and reasonable under the circumstances of this case. Further, it is undisputed that Mrs. Hendrickson, as administrator, is entitled to recover the uncontroverted amount of $4,400.00 on behalf of the estate as funeral expense.

From these findings, the Court concludes that Mrs. Georgia G. Hendrickson, Administratrix of the Estate of Homer Hendrickson, Deceased, is entitled to recover judgment in this proceeding in the total sum of $826,760.00 for the use and benefit of the

2. Source: Table at page 65, Economic Damage Calculator, supra.

estate, herself, and the three adult children, to be allocated and distributed in accordance with the findings of the Court set out above.

## DAMAGES OF MRS. SANDRA ALLISON AND TWO CHILDREN AND MRS. J. B. ALLISON AND JACK ALLISON

At the time of his death in the tragic airplane accident on December 6, 1974, Arthur J. Allison was 40 years of age. His wife, Sandra, was 37 years of age and they had enjoyed a happy married life of some 15 years. They were fortunate to have two fine children, Arthur, age 14, and Lawrence, age 2. Mr. Allison was also survived by his mother, Mrs. J. B. Allison, and a brother, Jack Allison. A claim is made by or on behalf of each of the survivors, individually, for damages arising out of Mr. Allison's wrongful death.

According to the mortality tables in Ark. Stats.Anno. § 50–705, Mr. Allison had a life expectancy of 31 years. In his testimony as an expert witness, Dr. Raleigh Ralls, an economist, stated that his "work life expectancy" would have been approximately 26 years. Dr. Ralls also testified that it could reasonably be anticipated that Mr. Allison would have had increases in earnings averaging 5.5% per year during the remainder of his work life expectancy. Mr. Ralls detailed the factors which he considered in arriving at the anticipated contributions of Mr. Allison to his family.

Mr. Allison had a high school education, three years of college, and was veteran of service with the Air Force. He was a trained, experienced, professional pilot with ratings which would qualify him for virtually any type of employment in connection with airplanes. He had been an employee of Ragsdale Aviation, Inc., a large aircraft dealership, for some five years and had recently been promoted to the position of Sales Manager.

His salary was only $13,800.00 per year. However, he should be credited with the value of a profit sharing plan and fringe benefits which he also enjoyed in his employment, which the Court finds increased the amount he would have had available for contribution to his survivors by a total average of some $3,400.00 per year. From this amount there must be deducted an amount to provide for Mr. Allison's personal consumption, which is found to be some $1,400.00 per year, and an amount to provide for probable income tax liability, which the Court finds should be at a rate of some 10% of base salary, $1,380.00. This would result in an amount of $14,020.00, which the Court finds should be reasonably anticipated to have been available for contribution to his survivors as of the time of his death.

Beginning with this amount and applying the 5.5% annual increase in contributions derived from the testimony of Dr. Ralls, the Court finds that, for the period of some three years elapsing between the date of Mr. Allison's death and the date of this award, Mr. Allison would have contributed a total amount of $44,415.00 to his wife and two sons. No discount factor is applicable to this amount. From the evidence, the Court finds that this sum should be apportioned to Mrs. Sandra Allison, $29,415.00; to Arthur and Lawrence, the sum of $7,500.00 each.

Future contributions from the date of the award through the remaining 23 years of Mr. Allison's "work life expectancy", assuming the 5.5% annual increase in contributions, would total the rounded sum of $726,000.00. Applying the 6% discount factor to reduce this amount to present value would result in a rounded present value of future contributions of $339,000.00.

Considering the ages, relationships, probable needs and other factors shown by the evidence, the Court finds that such future contributions should be allocated to Lawrence, $40,000.00, to Arthur, $6,000.00 and the balance, $293,000.00, to Mrs. Sandra Allison.

The Court further determines that the amount of $12,500.00 should be awarded to Arthur for extraordinary mental anguish. Lawrence, only two years of age at the time of his father's death, would have experienced no mental anguish. However,

882

both of the children will sustain the loss of the parental guidance which their father would have provided, Arthur for a few years, and Lawrence will have no recollection of his father. The Court finds that Arthur should recover the amount of $2,000.00 for such loss and that Lawrence should recover the amount of $15,000.00 for such loss.

 Mrs. Sandra Allison, in view of the nature and the untimeliness of her husband's death, has suffered great and unusual mental anguish. She has been left with the great responsibility of being the sole parent of an infant child. The Court finds that she should recover the amount of $35,000.00 for such mental anguish. She has also lost the anticipation of some 31 years of companionship, society, services and assistance of her husband, including the services which he would have provided in assisting her in the rearing and instruction of the two children, particularly the baby. The Court is of the opinion that, under the circumstances as disclosed by the evidence, she should be awarded the amount of $45,000.00 for such loss of consortium.

In summary, the court concludes that Mrs. Sandra Allison should recover in her own behalf the amount of $402,415.00, for the use and benefit of Arthur Allison the sum of $28,000.00, and for the use and benefit of Lawrence Allison the sum of $62,500.00. From the evidence, the Court finds that Mrs. J. B. Allison and Jack Allison have failed to show such a close relationship as would support an award of damages for extraordinary, unexpectable and unusual mental anguish. Also, as stated, funeral expense cannot be recovered in the absence of an administration.

## DAMAGES OF MRS. JOYCE H. MARTIN AND FOUR CHILDREN AND THE MOTHER AND TWO SISTERS OF BEN. MARTIN

Benjamin W. Martin was 48 years of age at the time of his death. He then had a life expectancy of 25 years, as set out in the mortality tables in Ark.Stat. § 50–705, and a "work life expectancy" of some 20 years, according to the testimony of the expert witness, Dr. Barton Westerlund.

His survivors include his widow, Mrs. Joyce H. Martin; their four children, Michelle, age 11; Ben, Jr., age 15; Suzanne, age 19; and Cherie, age 21; his mother, Mrs. Paul B. Martin; and two sisters, Mrs. Jane Rogers and Mrs. Ruth Fitton.

Mr. Martin was the substantial owner and chief executive officer of four business corporations. He had a gross income from all sources, in 1974, of some $329,000.00. Of this amount, Dr. Westerlund, the economist, testified that $204,000.00 was "earned income", as opposed to income from investments. However, the evidence showed that approximately $135,000.00 of this amount was in the form of "bonuses" from two of the corporations and the remainder in salary.

The evidence as to the characterization of income as deriving from the services of Mr. Martin or from the labor of others or return on capital invested is not as clear as it might be. The law of Arkansas must be followed in computing damages and in one of the latest expressions on the subject by the Supreme Court of Arkansas, *Holland v. Ratliff*, 238 Ark. 819, 384 S.W.2d 950 (1964), it is stated:

"There is much conflict in the authorities relative to the right to prove the loss of profits to the business of an injured party occasioned by his inability to give personal attention to the business, but where one is the sole owner of, and laborer in, a business, it appears that evidence of profits is clearly admissible. As far back as 1915, this court, in *St. Louis, I.M.&S. Ry. Co. v. Eichelman*, 118 Ark. 36, 175 S.W. 388, quoting from a Pennsylvania case, said:

' "Profits derived from capital invested in business can not be considered as earnings, but in many cases profits derived from the management of a business may properly be considered as measuring the earning power. This is especially true where the business is one which requires and receives the personal attention and labor of the owner".' . . .

'It is permissible always to prove one's capacity for and disposition to work, and any special qualifications which one has which tends to increase his earning capacity may be shown. And it was, therefore, competent here to show what appellee's duties were in connection with his business; what his qualifications were for discharging those duties; what the services of one similarly qualified would have been worth to this business;' . . .

'Various phrases have been used to describe the compensable loss sustained when a self-employed person is disabled. We have said that 'profits derived from the management of a business may properly be considered as measuring the earning power. This is especially true where the business is one which requires the personal attention and labor of the owner.' [Eichelman, supra]. Much to the same effect is the statement that the damages are to be measured by the value of the proprietor's services . . ."

Arkansas' rule on considering income from a business in determining damages for personal injuries thus appears to be more liberal and flexible than that expressed by Judge Tuttle in Hartz v. U. S., 415 F.2d 259 (5 Cir. 1969) wherein he states that, "The court also should properly have disregarded the income earned by his partially owned corporation except to the extent that he received a salary from it, for the stock in the corporation was not lost by his death, but became a part of his estate."

The evidence in the case at bar reveals that the business corporations were actively managed by Mr. Martin, that the income derived therefrom was in great measure attributable to his own skill, experience, business acumen, contacts and good will. These were obviously personal and valuable assets which died with him. It is true that the corporations survive him, but in the absence of the personal management by Mr. Martin and those personal skills and assets which he alone possessed, the assets of the corporations are worth far less than they were under his management.

Further, it is obvious that one or more persons will be required to manage these corporations, and that to hire a person with the background, intelligence, contacts, and other attributes necessary to continue any effective management will require the payment of a substantial salary. What the Court must seek to determine is by what amount the survivors have lost contributions from Mr. Martin derived from his services or worth, realizing that they might expect to continue to receive any profits derived from return on investment or labor of others.

Mr. Martin's salaries in the year preceding his death totalled some $70,000.00. In addition to those salaries he received some $135,000.00 in bonuses from the companies. There was testimony that the Internal Revenue Service had determined that these bonuses were remuneration for services of Mr. Martin, and did not constitute a return on investment. However, it is further shown that the amount of such bonuses fluctuated from year to year, and that no bonuses might be paid in the absence of profits by the corporations.

Taking all of the evidence on this point into consideration, the Court concludes that the value of the services of Mr. Martin to his corporations on an average annual basis was $150,000.00. In Hartz v. U. S., supra, it is made clear that personal consumption and tax liability must be considered in determining the amount available for contribution to the survivors. In 1974, on total income of some $329,000.00, taxes of some $111,000.00 were paid, a rate approximating 35%. The Court concludes that 35% would be a fair rate at which to reduce the income to allow for payment of income taxes.

Although the evidence showed that Mr. Martin made few direct expenditures from personal funds on himself, it is apparent from the record that he did enjoy the benefits of the home, trips, meals, clothing, automobiles, and a part of the entire "family consumption". The evidence is also clear that he was charitable, civic minded, and made substantial contributions both in time and money to civic, charitable and church

groups. From all of this, the Court finds that it is reasonable to expect that Mr. Martin would have either consumed for his own benefit or have contributed to others than his survivors from his income an amount equal to not less than 10% of that income.

Applying these deductions to the value of the services of Mr. Martin would leave some 55% of the gross value of his services available for contribution to his survivors. This would give a product of $82,500.00 as a base for annual contributions to his survivors. It is noted that Dr. Westerlund did not project any increase in such "earnings" over the work life expectancy of Mr. Martin.

From the date of death to the date of this award, some three years, such contributions would total $247,500.00 and such amount would not be subject to reduction to present value.

At the time of Mr. Martin's death his daughters, Cherie, then age 21, and Suzanne, then age 19, were students in college. Mr. Martin was generous with his children and had the means with which to express that generosity. The daughters were attending excellent and expensive schools. The Court finds that Mr. Martin would have contributed to his adult daughters during those three years the sum of $26,000.00 each. The Court further finds that he would have contributed to the minor children, Ben, Jr., and Michelle, who were residing in the home, $8,000.00 each during those three years. The remaining $179,500.00 for those three years would have been contributed to Mrs. Joyce H. Martin.

■ Projecting the annual contributions over the 17 years remaining of Mr. Martin's work life expectancy after the date of this award, without any factor for inflation or increase in income, gives a product of $1,402,500.00 as the total of such expected annual contributions. Applying the discount rate of 6% to reduce such sum to its present value,[3] yields a present value of the total of such future contributions of $864,-000.00.

Taking into consideration the ages, needs, relation, educational requirements, amounts available for contribution, and other factors shown by the evidence, the Court finds that of these future contributions Cherie should receive $7,000.00; Suzanne, $14,000.00; Ben, Jr., $40,000.00; Michelle, $48,000.00 and Joyce H. Martin, $755,000.00.

■ Mrs. Joyce H. Martin and each of the four children have, under the evidence, made proof of facts which warrant the award of damages for extraordinary mental anguish. The Court finds that the widow was mentally and emotionally distressed and depressed as a result of the untimeliness and manner of the death of Mr. Martin. She further was faced with what, to her, appeared to be monumental and insurmountable responsibilities for the family and the continuation of the business enterprises, which produced added anxieties. Under the circumstances as shown by the evidence, the Court finds that an award of $30,000.00 to Mrs. Joyce H. Martin for such mental anguish is justified.

The children not only experienced compensable mental anguish, but lost the supervision of their father and the moral and other training which he could have been expected to provide. For such damages, the children are entitled to receive compensation as follows: Cherie, $7,000.00; Suzanne, $7,000.00; Ben, Jr., $9,000.00; and Michelle, $10,000.00.

■ There is not sufficient evidence before the Court from which the Court may conclude that the mother and sisters of Mr. Martin have suffered compensable mental anguish or other compensable elements of damage. Although their loss has been great and assuredly heart-felt, the facts are not such as would, under the law of Arkansas, justify an award of damages. Their claims, therefore, must be denied.

■ Mrs. Joyce H. Martin has further lost the society, companionship and services of her husband over an expected period of

3. Source: Table at page 57, Economic Damage Calculator, supra.

some 25 years. This was the only marriage for either of them. Their relationship was close and enduring. Mr. Martin was apparently a good husband, companion and helpmate, as well as a good provider. The Court finds that the widow is entitled to an award of $20,000.00 for loss of consortium.

It is undisputed that the estate is entitled to the recovery of $1,739.00 for funeral expenses, for which judgment should be entered.

The Court, therefore, concludes that Mrs. Joyce H. Martin, as administratrix of the estate of Benjamin W. Martin, is entitled to recover the total amount of $1,196,239.00 for the use and benefit of the estate, herself, the adult and the minor children, to be allocated and distributed in accord with the foregoing findings and conclusions of the Court.

## DAMAGES OF RAGSDALE AVIATION, INC.

The final issue of damages concerns the claim of Ragsdale Aviation, Inc., for the destruction of the 1970 model Cessna 414 aircraft. The airplane was described in some detail in the accompanying opinion on liability, and is described in even greater detail in the exhibits herein. It was little used, in good condition, and equipped with many desirable options and accessories. The only evidence of record as to its value is the deposition of the general manager of the owner, who states that its fair market value as of the date of the accident was $133,700.00 and that it had no salvage value after the crash.

It is noted that the United States called as one of its witnesses a well qualified dealer in such aircraft, who might readily have been called upon to state his opinion of the market value, but no such inquiry was made.

The Court finds that Ragsdale Aviation, Inc., is entitled to judgment in the amount of $133,700.00 as the fair market value of the aircraft, N44JG, which was destroyed in the crash and had no salvage value.

In these two separate memoranda the Court has fixed the liability of the United States of America and has fixed the amount of damages to which each of the parties and beneficiaries is entitled. Separate precedents for judgment will be prepared by counsel on behalf of the respective parties as to their respective clients. Any amount received or to be received as proceeds of the settlements of the actions among the parties plaintiff by or for the use and benefit of any of the parties plaintiff or the beneficiaries in whose behalf judgment is awarded shall be deducted from and credited toward the satisfaction of such judgments herein against the United States of America, pursuant to the requirements of the Uniform Contribution Among Tortfeasors Act, Ark.Stats.Anno. § 34–1001, et seq. Such precedents will then be forwarded to counsel for the United States for approval as to form or objection thereto and, after such review, shall be furnished to the Court for its consideration. Precedents shall be prepared and forwarded to the United States Attorney within 10 days after the entry of this memorandum and shall be furnished by him to the Court within 5 days thereafter, to the end that final judgments in the consolidated cases may be entered promptly.