586 F.2d 1206
 Joyce H. MARTIN, Executrix of the Estate of Benjamin Wilson
Martin, Deceased, Mrs. Georgia G. Hendrickson,
Administratrix of the Estate of Homer Hendrickson, Deceased,
Sandra Allison, Individually and as next friend of Arthur J.
Allison, Jr., and Lawrence Allison, minors, Mrs. Carlene
Arnold Smith, Steven Lee Smith, and Ragsdale Aviation, Inc., Appellees,
v.
UNITED STATES of America, Appellant,
v.
Joyce H. MARTIN, Executrix of the Estate of Benjamin Wilson
Martin, Deceased, Ben W. Martin Enterprises, Inc.,
Martin Terminals Company and Logicon,
Inc., Appellees.
 No. 78-1134.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Sept. 13, 1978.
Decided Nov. 2, 1978.
Rehearing Denied Nov. 29, 1978.
 
 Mark N. Mutterperl, Atty., Appellate Section, Civil Div., U. S. Dept. of Justice, Washington, D. C., for appellant; Barbara Allen Babcock, Asst. Atty. Gen., Washington, D. C., W. H. Dillahunty, U. S. Atty., Little Rock, Ark., and Leonard Schaitman, Atty., Washington, D. C., on brief.
 Henry Woods of McMath, Leatherman & Woods, Little Rock, Ark., and John G. Lile, III of Colemen, Gantt, Ramsay & Cox, Pine Bluff, Ark., for appellees; Charles B. Roscopf, Helena, Ark., Tom H. Davis and George M. Fleming, Austin, Tex., Silas B. Cooper, Abbeville, La., and William R. Overton, Little Rock, Ark., on brief.
 Before HEANEY and STEPHENSON, Circuit Judges, and HANSON,* Senior District Judge.
 HEANEY, Circuit Judge.
 
 
 1
 On December 6, 1974, at approximately 5:24 P.M., a twin-engine Cessna, bearing the registration number N44JG, left New Orleans, Louisiana, enroute to Pine Bluff, Arkansas. The plane was owned by Ragsdale Aviation, Inc. Aboard the plane were Arthur J. Allison, an employee of Ragsdale and a qualified pilot; Benjamin W. Martin, also a qualified pilot; and Homer Hendrickson and Marvin L. Smith, two non-pilots, who were associates of Martin. The aircraft was equipped with dual flight controls and instruments. Shortly after 7:26 P.M., in weather conditions of fog and drizzle, N44JG crashed in a wooded area some 1.3 nautical miles north of Runway 17 at Grider Field in Pine Bluff, Arkansas. The aircraft was a total loss, and all aboard were killed.
 
 
 2
 Ragsdale Aviation, and the families of the men killed in the crash, brought this action against the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 Et seq. They claimed that the United States was liable for the negligence of the air traffic controllers at Little Rock and Pine Bluff who communicated with N44JG immediately prior to the crash and who were, at that time, acting within the scope of their employment with the Federal Aviation Administration (F.A.A.). The District Court found that the air traffic controllers were negligent and entered a judgment of $2,926,666.43 against the United States. Martin v. United States, 448 F.Supp. 855 (E.D.Ark.1977). The United States appeals. We affirm in part and reverse in part.
 
 I.
 
 3
 The District Court found the air traffic controllers at the Little Rock and Pine Bluff airfields to have been negligent in several respects. Shortly after 7:16 P.M., both the Pine Bluff and the Little Rock controllers were aware that weather conditions at Grider Field, which were reported to N44JG at 6:55 P.M. and 7:16 P.M., were no longer accurate; however, the decrease in visibility from one mile to three-quarters of a mile was not reported to the plane until 7:25 P.M., approximately one minute before the crash, and the decrease in ceiling from three hundred feet to zero was not reported to the plane until 7:26:27, by which time it was of no use to the pilot.[1] Id. at 866-868. The District Court noted that the vital information regarding the decreased ceiling was withheld from N44JG notwithstanding the fact that, at 7:12 P.M., the pilots of the plane had expressed concern about the ceiling by inquiring as to what ceiling an immediately preceding plane had found when landing at Pine Bluff. Id. at 868. The court found that the failure of the air traffic controllers to immediately warn N44JG of the worsened conditions was a proximate cause of the crash since, as the plaintiffs' expert witness testified, 999 out of 1,000 pilots would not have attempted an approach under the weather conditions as they then existed. Id. at 867.
 
 
 4
 The District Court also found that an erroneous barometric altimeter setting, given by the Pine Bluff controller to N44JG, contributed to the crash since it caused the pilots to believe that the plane was one hundred feet higher than its actual altitude.[2] The court found that when N44JG made its fatal approach, the pilot sighted the strobe lights at the end of the runway; and at that time, in accordance with F.A.A. regulations, changed from an instrument approach to a visual approach.[3] The plane then passed through the minimum descent altitude (MDA) toward the runway.[4] Id. at 870. The combination of factors that the plane was actually one hundred feet lower than the pilots believed, that the ground and trees below were enshrouded with fog, and that the pilot expected to break through the ceiling at three hundred feet caused the pilots to become spatially disoriented as to their altitude with the result that the plane crashed into trees shortly before the runway. Id.
 
 
 5
 The United States attacks these findings on several grounds. First, it argues that the controllers had no duty to warn N44JG of the change in visibility prior to when the decreased visibility information was given. It argues that since, under Arkansas law, there is no duty to warn of something that is obvious or of which the deceased or injured person was aware, See Oliver v. Hallett Construction Company, 421 F.2d 365, 370 (8th Cir. 1970), the air controllers were under no duty to report this information to N44JG since the pilots must have observed the visibility conditions in the vicinity of Runway 17 when the plane executed a prior missed approach.[5]
 
 
 6
 This contention is without merit. Between the plane's two approaches to the airfield, the visibility decreased from one mile to three-quarters of a mile, the minimum visibility allowable for landing. The supervisory air traffic controller at Pine Bluff conceded, on cross-examination, that this decrease was significant. Indeed, the significance of this decrease in visibility to the controllers was obvious since a special report containing this information was issued at 7:25 P.M. In Ingham v. Eastern Air Lines, Inc., 373 F.2d 227 (2d Cir. 1967), a similar decrease in visibility was characterized as follows:
 
 
 7
 In our view, a drop in visibility of 25%, from one mile to three-quarters of a mile, bringing existing weather conditions dangerously close to landing minimums, is such a critical change that, in the interests of safety, it should have been reported to the crew of EAL 512.
 
 
 8
 Id. at 235.
 
 
 9
 Since the decrease in visibility occurred between the two approaches of N44JG, it is difficult to see how the pilot could be charged with knowledge of it.
 
 
 10
 The government next contends that the Pine Bluff controller was under no duty to report the decrease in visibility until 7:25 P.M., some nine minutes after first becoming aware that visibility had worsened since the pertinent weather manual requires that controllers inform pilots when visibility decreases to less than one mile after such observations are "(t)ake(n) (and) record(ed)."[6] It argues that although the controllers were aware shortly after 7:16 P.M. that visibility had decreased, since the complete special weather observation was not ready until 7:25 P.M., no duty to warn of the change arose prior to that time.
 
 
 11
 This assertion ignores the realities of the situation. At 7:16 P.M., N44JG was specifically advised by the Little Rock controller that visibility was one mile. At that time, the plane had missed one approach and was preparing to make a second. Both control towers were aware, by 7:18 P.M., that the visibility just given to the pilot was no longer accurate but no mention of this was made until 7:25 P.M., less than two minutes before the crash. The government concedes that there may be situations where the duty of an air traffic controller to impart critical information to those dependent upon it goes beyond the duties imposed by the operations manuals of the F.A.A. Hartz v. United States, 387 F.2d 870, 873 (5th Cir. 1968). See also United Air Lines, Inc. v. Wiener, 335 F.2d 379, 395 (9th Cir. 1964). Under the circumstances here, the controllers were certainly under a duty to immediately correct the visibility information.
 
 
 12
 The government next contends that the air traffic controllers had no duty to warn the pilots of N44JG of the decreased ceiling prior to 7:26:23, when the plane reported over the VOR.[7] We disagree. The Pine Bluff controller's special weather observation, including the zero ceiling observation, was completed by 7:25 P.M. The controller did not, however, include the new ceiling information in the weather report given to N44JG at that time. The controller waited until almost a minute and a half later to report the change, despite the fact that he was aware that the plane was in the process of making its final approach and that N44JG was the only plane that the Pine Bluff tower was handling. The District Court's finding that the controller was negligent in failing to immediately convey the revised ceiling information is not clearly erroneous.
 
 
 13
 The government next contends that even if the controllers were negligent in giving the pilots of the plane an erroneous altimeter setting or in failing to immediately convey revised weather information, that negligence was not a proximate cause of the crash. The gist of the government's argument is that although the erroneous altimeter setting and the delay in transmitting current weather conditions might have affected the pilots' decision to land at Grider Field and that decision to land might have been the remote cause of the crash, the actual and efficient cause was the pilots' own negligence in flying the plane into the ground.
 
 
 14
 Under Arkansas law, proximate cause is a cause which, in a natural and continuous sequence, produces damage and without which the damage would not have occurred. Scoville v. Missouri Pacific Railroad Company, 458 F.2d 639, 646 (8th Cir. 1972); Bull v. Manning, 245 Ark. 552, 433 S.W.2d 145, 148 (1968). Where the chain of causation between an original act of negligence and the ultimate injurious result is broken by a new and independent cause, then that cause is considered to be the proximate cause of the injury unless its occurrence was reasonably foreseeable to the original actor or if his own negligent conduct substantially increased the likelihood of the occurrence of the intervening cause. Dulin v. Circle F Industries, Inc., 558 F.2d 456, 467 (8th Cir. 1977). Although the manner in which the pilots flew the plane was obviously a concurrent cause occurring between the negligent acts of the controllers and the plane's crash, the decision of the pilots to attempt a second approach and to descend below the MDA was the reasonably foreseeable result of the controllers' negligence. The District Court found that had the pilots of N44JG been aware of the deterioration in weather conditions, no second attempt at landing would have been made. Martin v. United States, supra at 868. This finding is not clearly erroneous. See Deweese v. United States, 576 F.2d 802, 805 (10th Cir. 1978); Ingham v. Eastern Air Lines, Inc., supra at 236-237.
 
 II.
 
 15
 The government next contends that even if the air traffic controllers were negligent, the contributory negligence of the pilots of the plane[8] should defeat or diminish their recovery and the recovery of Ragsdale Aviation, Inc., Allison's employer. It contends that the pilots were negligent in allowing the plane to descend below the MDA, in attempting to execute an abnormal approach for landing and in failing to immediately report to the Pine Bluff controller when the plane passed over the VOR.
 
 
 16
 The District Court found that the government had failed to establish, by a preponderance of the evidence, that the aircraft was operated in a negligent manner. Martin v. United States, supra at 871-872. It found that the plane's initial descent below the MDA was due to the incorrect altimeter setting given to the pilots and that the pilots did not descend further until they were able to see the runway lights in accordance with F.A.A. regulations.[9] Id. at 870-871. "There is no showing in the record that the pilot failed to observe correct procedures with the information which had been provided to him * * *, as he was in a landing attitude in the belief that he was 100' higher than he actually was and that the ceiling was approximately 300'." Id. at 871. The court also found that the pilots' delay in reporting passage over the VOR was due to their waiting for a clear indication from the instruments that the station had been passed and to the pilots' preoccupation with preparing the aircraft for landing. Id. at 869. We cannot say that these findings are clearly erroneous.
 
 
 17
 The factual findings of the trial court are entitled to great weight; and under Fed.R.Civ.P. 52(a), we must accept them unless they are clearly erroneous. Ridgway v. United Hospitals Miller Division, 563 F.2d 923, 927 (8th Cir. 1977). This standard "applies to reasonable inferences to be drawn from stipulated or undisputed facts, and it is for the trial court rather than the appellate court to draw legitimate and permissible inferences." Lewis v. Super Valu Stores, Inc., 364 F.2d 555, 556 (8th Cir. 1966). Accord, School District No. 54 v. Celotex Corp., 556 F.2d 883, 885 (8th Cir. 1977). The inferences which can be drawn from the undisputed facts in this case, both with regard to the negligence of the air traffic controllers and with regard to the alleged contributory negligence of the pilots of the plane, create a very close case. However, the mere fact that, on the same evidence, we might have reached a different result does not justify our setting aside the factual findings of the District Court. See United States v. National Asso. R.E.B.,339 U.S. 485, 495-496, 70 S.Ct. 711, 94 L.Ed. 1007 (1950).
 
 III.
 
 18
 Finally, the government contends that the District Court's awards for loss of contribution from the decedents Smith, Hendrickson and Allison are excessive.
 
 
 19
 In the case of Marvin L. Smith, the District Court found that since he was forty-one years of age at the time of the accident, he had a life expectancy of thirty years. See Ark.Stat.Ann. § 50-705. It found that Smith had a work life expectancy of twenty-five years, based on the work life expectancies of the other parties, the age, occupation, health and habits of Smith, and the testimony of plaintiffs' expert witness, Dr. Duggar. Martin v. United States, supra at 877-878. The government challenges this finding on the basis that the court incorrectly cites Dr. Duggar's estimate of Smith's work life expectancy to be twenty-one years, when, in fact, it was 22.3 years. See id. at 877. We agree that the court does misstate Dr. Duggar's testimony; but since the misstatement, if any, obviously did not benefit Smith and since Smith has not appealed, the misstatement is not grounds for setting aside the judgment.
 
 
 20
 Homer Hendrickson was fifty years of age at the time of his death. The District Court found that, considering the nature of Hendrickson's employment and his health and industry, his work life expectancy would, in all probability, coincide with his life expectancy. Hendrickson's life expectancy was found by the court to be twenty-three years. Id. at 878-879. The government does not challenge the court's finding that Hendrickson would have continued his employment for the remainder of his life. It does, however, challenge the twenty-three-year life expectancy used by the court, citing the testimony of plaintiffs' expert witness, Dr. Ralls, that Hendrickson had a life expectancy of approximately twenty-one and one-third years. The court apparently based its finding of a twenty-three-year life expectancy on Ark.Stat.Ann. § 50-705 and on the testimony of Dr. Ralls. Id. at 878. Since the court's finding is in accordance with the Arkansas statute, and that is the result which the court clearly intended, we do not believe that the minor discrepancy between Dr. Ralls' actual testimony and what the court believed it to be warrants reversal of the judgment entered in favor of Hendrickson's heirs.
 
 
 21
 The government also challenges the work life expectancy of twenty-six years used by the District Court in calculating the loss of contribution from Arthur J. Allison. The government contends that this figure was based on the District Court's erroneous impression that Dr. Ralls gave Allison a twenty-six-year work life expectancy at the time of his death when, in fact, it was 23.2 years. Since the twenty-six-year figure used by the court does appear to be based solely on an erroneous impression of Dr. Ralls' testimony, See id. at 881, we remand this issue to the District Court for redetermination. If it was the intention of the court to find a work life expectancy for Allison of twenty-six years, it may reenter an award based on that figure, together with a statement of its reasons for such an award. If, on the other hand, the court's use of the twenty-six-year figure was based solely on an erroneous impression as to the testimony of Dr. Ralls, the court may accordingly recompute Allison's work life expectancy and the award entered thereon.
 
 
 22
 We have considered the government's other contentions as to the alleged excessiveness of the awards made by the District Court and find them to be without merit.
 
 
 23
 Affirmed in part, reversed in part and remanded for further proceedings not inconsistent with this opinion.
 
 
 
 *
 WILLIAM C. HANSON, United States Senior District Judge for the Southern District of Iowa, sitting by designation
 
 
 [1]
 It is conceded by the United States that the Pine Bluff controller's last broadcast at 7:26:27, which contained the complete, updated weather report, was either not received by the pilots of the plane or, if it was, it was not received in time for them to act to avoid the crash
 
 
 [2]
 A barometric altimeter is a device which indicates the altitude of the aircraft above mean sea level when it is set with the correct barometric pressure. The correct altimeter setting of 29.80 was transmitted to N44JG by the Little Rock controller at 6:55 P.M. and at 7:16 P.M., and by the Pine Bluff controller at 7:09 P.M. At 7:21 P.M., however, the Pine Bluff controller broadcast a setting of 29.90, which was admittedly incorrect. This error was corrected in the final broadcast by the Pine Bluff controller at 7:26:27, which the parties agree was not received by the plane in time to avert the crash
 The District Court found that reliance by pilots upon reports such as altimeter settings, which are received from air traffic controllers, is virtually automatic, resulting in the pilots' immediate compliance. From this, the court concluded that the erroneous altimeter setting was, in fact, dialed into the instrument by the pilots of N44JG, and that their action in doing so was in no way negligent. Martin v. United States, 448 F.Supp. 855, 870 (E.D.Ark.1977). This finding is not clearly erroneous.
 
 
 [3]
 See Federal Aviation Regulations, 14 C.F.R. § 91.117
 
 
 [4]
 The minimum descent altitude (MDA) is that altitude which a pilot must maintain until he is able to see markings identifiable as the approach end of the runway. Federal Aviation Regulations, 14 C.F.R. § 91.117. The MDA in the vicinity of the Pine Bluff runway is approximately three hundred and seventy-four feet above ground level. Martin v. United States, supra at 862
 
 
 [5]
 Just after 7:13 P.M., N44JG informed the Pine Bluff controller that it had made a landing approach but pulled up when it reached the MDA because it had failed to see the runway lights in time to land. The controller inquired whether the pilots wanted to try again, and N44JG replied in the affirmative. It was during the plane's second approach, thirteen minutes later, when the plane was, because of the erroneous altimeter setting, one hundred feet closer to the ground, that the pilots apparently saw the runway lights, attempted to land and crashed
 
 
 [6]
 Federal Meteorological Handbook No. 1, Surface Observations, ch. A-2, § 3.7.2
 
 
 [7]
 The Pine Bluff VOR is an omni-directional radio broadcasting facility located 3.9 nautical miles north of Grider Field. See Martin v. United States, supra at 862
 
 
 [8]
 In view of our decision sustaining the District Court's finding that the plane was not negligently operated, we need not address the question as to whether Martin, or Allison, or both, were responsible for the operation of the plane at the time of the crash
 
 
 [9]
 Federal Aviation Regulations, 14 C.F.R. § 91.117