**SOUTHERN ILLINOIS STONE COMPANY, a corporation, Appellee,**

v.

**UNIVERSAL ENGINEERING CORPORATION, a corporation, and Machinery, Inc., a corporation, Appellants.**

No. 78–1225.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 14, 1978.

Decided Feb. 12, 1979.

Rehearing Denied March 5, 1979.

Victor G. Savikas (on brief), of Karon, Morrison & Savikas, Chicago, Ill., argued, for appellants; John F. Newell, Chicago, Ill., Forrest M. Hemker of Greensfelder, Hemker, Wiese, Gale & Chappelow, and Tyree C. Derrick, St. Louis, Mo., on brief.

Richard G. Steele (on brief), of Finch, Bradshaw, Strom & Steele, Cape Girardeau, Mo., argued, for appellee; Lehman Finch and Stephen E. Strom, Cape Girardeau, Mo., on brief.

Before STEPHENSON, HENLEY and McMILLIAN, Circuit Judges.

HENLEY, Circuit Judge.

In this diversity action Universal Engineering Corporation and Machinery, Inc., the Sellers, appeal the decision of the district court[1] awarding Southern Illinois Stone Company, the Buyer, damages totalling $311,115.00 for the Sellers' breach of warranty of production capacity on rock crushing equipment manufactured and sold by them to the Buyer. We affirm the district court's decision holding the Sellers liable for breach of warranty but determine that the court erred in refusing to grant the Sellers' counterclaim pursuant to Illinois law for prejudgment interest on the unpaid balance of the purchase price.

The Buyer operates limestone quarries in Illinois and Missouri and sells crushed limestone to various local purchasers, including highway construction companies. In the early 1970's several interstate highways were being constructed in the Buyer's Illinois trade area and its Buncombe, Illinois plant could not meet the increased demand for crushed limestone. Consequently, it sought to increase the plant's production capacity and entered into negotiations with the Sellers for the design, manufacture and sale of new rock crushing equipment.[2] The Buyer signed purchase orders from both Sellers which provided for a purchase price

---

1. The United States District Court for the Eastern District of Missouri, The Honorable John K. Regan, Senior District Judge, presiding.

2. Universal Engineering, an Iowa corporation, designed and manufactured the plant's new components and sold them through Machinery, Inc., a Missouri corporation, which is its sales representative in the Illinois area.

of slightly over $400,000.00. These documents indicated that the purchased equipment was designed to create a "1,000 ton per hour plant."

The Buncombe plant, as modified by the purchased equipment, is divided into primary and secondary sections. In the primary section truck loads of limestone taken from the quarry are dumped into a "rock box" and are carried by a vibrating "grizzly feeder" to the primary rock crusher. The vibration of this feeder allows smaller stones to fall through a grate in the bottom of the rock box and onto a conveyor belt. Larger stones proceed through a rotary crusher that breaks them into smaller pieces which then fall on the same conveyor belt. This combined product is carried by the belt to a storage or "surge" pile at the end of the primary system. The secondary system is fed from the surge pile and consists of additional belts, feeders and crushers which sort and further reduce the size of the rock.

In designing the plant the parties determined the Buyer's existing equipment would suffice for the secondary system. Production was to be increased by adding a new primary system which consisted of a 5165 Impact Master rock crusher with a production capacity rated by the Sellers at 750 t. p. h., a vibrating grizzly feeder with a capacity of 780 t. p. h., a conveyor belt, and other related equipment. The Sellers recommended and sold this somewhat under-sized primary system to the Buyer, apparently thinking it would give rise to a 1,000 t. p. h. plant because of the relatively soft nature of limestone. Such was not the case.

Problems with the primary system developed immediately. The Buyer, which was primarily responsible for installing the new equipment, discovered numerous missing and ill-designed parts. These problems were corrected and the plant became operational in August of 1972, but shortly thereafter a leg on the primary system conveyor belt buckled. The leg was repaired and strengthened by the Sellers and production continued until serious problems developed

with the primary crusher. The crusher could not accept the heavy flow of rock carried to it by the grizzly feeder. This caused the rock to jam in the crusher and in turn necessitated a shutdown of the feeder. The Buyer cleared these rock jams by setting off small dynamite charges in the mouth of the crusher, causing the rock to break loose and fall into the crusher. Eventually, under the strain of the heavy crushing load and perhaps in part because of such dynamiting, the steel crusher rotor began to crack and had to be replaced on three separate occasions, each time causing a complete shutdown of the primary system. The parties worked together to solve this problem, with the Sellers providing new rotors and the Buyer providing the labor to install them. Repeated replacement of the rotor proved unsatisfactory, however, and in January of 1973 the Sellers agreed to install a larger crusher rated at a capacity of 1400 t. p. h. This replacement was completed in May of that year with the Sellers providing the new crusher and the Buyer providing the labor for installation. And, since the installation of the larger crusher, the plant has functioned satisfactorily.

The Buyer later brought this suit alleging the Sellers had breached their express and implied warranties that the primary system initially designed by them would produce an *average* of 1,000 t. p. h. of crushed limestone. It sought damages for lost profits, excessive production costs and labor expenses. The Sellers contended they had warranted only that the primary system had a *capacity* to produce 1,000 t. p. h. over short periods of time and under optimal operating conditions and that this warranty had not been breached. They counterclaimed for the unpaid balance of the purchase price and for prejudgment interest on that amount.

The case was tried before the district court without a jury, and the parties stipulated that the contractual issues were governed by Illinois law. The district court determined the rock box and conveyor for the primary system were properly designed

and fit for the purpose for which they were sold. It also found the Sellers had not warranted that the 5165 crusher would produce an average of 1,000 t. p. h. of crushed limestone on a sustained, continuing basis but only that the crusher had the capacity to produce 1,000 t. p. h. "at any given period of time and under the most favorable operating conditions." Nevertheless, the court held that the Buyer's evidence of the inadequate performance of the 5165 crusher was sufficient to establish that it had not performed at the warranted capacity. This breach was, of course, terminated in May of 1973 when the 1,400 t. p. h. crusher was installed.

The court rejected the Buyer's claim for lost profits as too speculative and characterized its estimate of $800,000.00 excessive production cost damages as inherently unfair. But, after reviewing the Buyer's evidence of production cost damages, the court determined the Buyer had incurred "some" excessive production costs and evaluated this item of damages at the reduced figure of $300,000.00. In addition it awarded $10,-000.00 for labor costs incurred by the Buyer in repairing the improperly designed primary system and $1,115.00 for miscellaneous expenses incurred in replacing missing or ill-designed parts. The Sellers were granted judgment on their counterclaim for the unpaid balance due on the purchase price but were denied prejudgment interest on this debt.

On appeal the Sellers contend the district court erred in finding them liable for breach of warranty because (1) the Buyer's evidence of breach of an average production warranty did not establish a breach of the 1,000 t. p. h. production capacity warranty; (2) the Buyer, in any event, was barred from recovery for the alleged breach because it failed to notify the Sellers of that breach as required by Illinois law; and (3) the Buyer's practice of dynamiting in the crusher constituted misuse of the purchased equipment which also bars recovery for breach of warranty as a matter of Illinois law. Additionally, the Sellers assert the Buyer's evidence of production cost damages was insufficient to support the district

court's judgment. And, finally, they allege that the court erred in denying their claim for prejudgment interest on the unpaid balance of the purchase price.

*The Warranty of Capacity.*

The Sellers freely admit, as found by the district court, that they warranted the Buncombe plant's new primary system at a production capacity of 1,000 t. p. h. But they contend the court erred in finding a breach of this warranty.

■ Under the Uniform Commercial Code, which has been adopted in Illinois, the buyer has the burden of proving a breach of warranty with respect to accepted goods. Ill.Rev.Stat. ch. 26, § 2–607(4); *Gillespie v. Werner Co.,* 43 Ill.App.3d 947, 2 Ill.Dec. 760, 357 N.E.2d 1203 (1976). Here the Buyer apparently conceded acceptance of the goods and instead argued the Sellers had breached their implied and express warranties that the plant's primary system, and in particular the 5165 crusher, would produce an average of 1,000 t. p. h. of crushed limestone. In support of this argument, the Buyer introduced numerous witnesses who testified to the repeated problems experienced in installing and operating the primary system.

After reviewing this testimony, the district court determined that (1) the conveyor belt leg had buckled because it had been improperly designed or because the Sellers had failed to instruct the Buyer on the necessity of "back-filling" around the legs to provide added support and (2) that the grizzly feeder and the 5165 crusher did not have the capacity to produce 1,000 t. p. h. of crushed limestone as warranted. This latter determination was based in part on the court's finding that the Sellers had improperly designed the feeder to operate in an inclined position rather than having the Buyer install it on a vertical axis, which caused certain springs in the feeder to break and occasionally resulted in complete shutdowns of the primary system. The principal problem, however, was with the 5165 crusher. The court found this crusher

was simply too small to crush limestone at the warranted capacity, even if the grizzly feeder were working properly. This finding was based on the Buyer's evidence that the crusher frequently jammed during normal operation and that its rotor cracked and had to be replaced on three separate occasions, again necessitating primary system shutdowns.

Unless we determine that these findings by the district court are clearly erroneous, we are bound to uphold its decision. And a finding of fact is only deemed clearly erroneous if it is not supported by substantial evidence, if it proceeds from an erroneous conception of the applicable law, or if on a consideration of the entire record the appellate court is left with the definite and firm conviction that a mistake has been made. Fed.R.Civ.P. 52(a); *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); *School Dist. No. 54 v. Celotex Corp.*, 556 F.2d 883 (8th Cir. 1977), and cases cited therein.

After carefully reviewing the record, we cannot say that the district court was clearly erroneous in finding the Sellers had breached the 1,000 t. p. h. warranty of capacity. The Sellers' argument that the Buyer's evidence of inadequate *average* production was not transferable to the issue of production *capacity* misapprehends the nature of the court's decision. In general, the Buyer's evidence of breach was directed to proving that the primary system failed to adequately produce crushed limestone. The district court simply found this evidence of inadequate average production also satisfied the heavier burden of proving the primary system could not produce 1,000 t. p. h. of crushed limestone at any given period of time and under the most favorable operating conditions. This finding is supported by substantial evidence in the record. It is apparent that there were repeated malfunctions in the plant's primary system during normal operations which were caused by improper design. Attempts to crush at the warranted capacity repeatedly resulted in damage to the equipment which, in turn, caused plant shutdowns. These problems existed during the entire period in which the 5165 crusher was installed and indicate that it never produced crushed limestone as warranted.

*Lack of Notice.*

Both parties agree that the Illinois Commercial Code requires a buyer to give timely and adequate notice of any breach of warranty. Failure to comply with this requirement bars the buyer from any remedy for the breach. Ill.Rev.Stat. ch. 26, § 2–607(3); *Berry v. G. D. Searle & Co.*, 56 Ill.2d 548, 309 N.E.2d 550, 554 (1974). The Sellers assert that the Buyer failed to notify them of the alleged breach of warranty. In particular, they contend the Buyer only gave them notice of the mechanical defects in the primary system and never complained about the system's production capacity. The district court made no express finding on the sufficiency of notice issue, but the record reflects that the court questioned several of the Sellers' witnesses as to what, if any, notice of the alleged breach they had received. It apparently concluded the Sellers' claim of inadequate notice was without merit.

In reviewing the Sellers' renewed complaint in this regard on appeal, we initially take note of the official comments to § 2–607(3)(a), which set out the nature of the Code's notice requirement. Comment four provides in pertinent part that

[t]he content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched. There is no reason to require that the notification which saves the buyer's rights under this section must include a clear statement of all the objections that will be relied on by the buyer, as under the section covering statements of defects upon rejection. Nor is there reason for requiring the notification to be a claim for damages or of any threatened litigation or other resort to a remedy. *The notification which saves the buyer's rights under this Article need only be such as informs the seller*

*that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation.* (Emphasis added.)

This is not to say, however, that any notice of defects in the goods will satisfy the requirements of § 2–607(3). It is not enough that the seller be given notice of the mere facts constituting a nonconforming tender; he must also be informed that the buyer considers him to be in breach of the contract. *See, e. g., Eastern Air Lines, Inc. v. McDonnell Douglas Corp.,* 532 F.2d 957, 973 (5th Cir. 1976); *Bonebrake v. Cox,* 499 F.2d 951, 956 (8th Cir. 1974); *Lewis v. Mobil Oil Corp.,* 438 F.2d 500, 509 (8th Cir. 1971); *Overland Bond & Investment Corp. v. Leathurman Howard,* 9 Ill.App.3d 348, 292 N.E.2d 168 (1972); R. Anderson, Uniform Commercial Code § 2–607:13 at 211 (1971).

■ When we apply these standards to the record before us, it is clear that the Buyer did more than merely notify the Sellers of defects in the primary system. Shortly after the purchase, the Buyer took the position that the primary system failed to adequately produce crushed limestone and sought a solution for this breach of contract through negotiation. The parties then worked together for several months in an attempt to repair the defective machinery which caused this problem. This is precisely the kind of notice to which Comment four makes reference—one which "opens the way for normal settlement through negotiation." In fact, a solution to the production capacity problem was reached when the Sellers provided a cure for the breach by providing a larger crusher. Therefore, we reject the Sellers' argument that the notice requirements of the Code were not met.

*Misuse of the Goods.*

■ It is generally stated that the doctrine of contributory negligence, per se, is not a defense to a contract action based on breach of warranty. *See, e. g., Hensley v. Sherman Car Wash Equipment Co.,* 33 Colo. App. 279, 520 P.2d 146 (1974); *Jacobs Pharmacy Co. v. Gipson,* 116 Ga.App. 760, 159 S.E.2d 171 (1967); *Hawkins Const. Co. v. Matthews Co.,* 190 Neb. 546, 209 N.W.2d 643 (1973). However, the courts have recognized that recovery for breach of warranty may be denied where the buyer's misuse of the goods has been the proximate cause of the alleged breach; such misuse is beyond the scope of the seller's warranty. *Processteel, Inc. v. Mosley Machinery Co.,* 421 F.2d 1074 (6th Cir. 1970); *Chisolm v. J. R. Simplot Co.,* 94 Idaho 628, 495 P.2d 1113 (1972); *Hobson Const. Co. v. Hajoca Corp.,* 28 N.C. App. 684, 222 S.E.2d 709 (1976). And the burden of proof is on the party seeking to establish a breach of warranty to show performance of conditions on which the right to assert the warranty depends. *Veretto v. Eli Lilly & Co.,* 369 F.Supp. 1254 (N.D.Tex. 1974); *Melcher v. Boesch Motor Co.,* 188 Neb. 522, 198 N.W.2d 57 (1972).

It is uncontroverted that the Buyer misused the primary system by setting off small dynamite charges in the mouth of the 5165 crusher to clear rock jams. While there was some evidence that such dynamiting was an industry wide practice, the Sellers recommended against it in the "operating tips" section of the crusher's instruction manual. They now contend that this misuse of the goods bars the Buyer's right to recover for breach of warranty as a matter of Illinois law.

We reject the Seller's contention that such a misuse of the goods bars a buyer's right to recover for breach of warranty as a matter of law.[3] In *Burrus v. Itek Corp.,* 46

---

3. We do not read *Willis v. West Kentucky Feeder Pig Co.,* 132 Ill.App.2d 266, 265 N.E.2d 899 (1971), a case heavily relied upon by the Sellers, as standing for this proposition. In *Willis* the buyer purchased a load of feeder pigs which were infected with cholera. The purchase order signed by the buyer contained express limitations on the seller's liability for the subsequent death of the animals due to disease.

Among these conditions precedent to the buyer's right to recovery was the requirement that the buyer have the pigs inspected by a veterinarian within seven days of delivery and notify the seller of any diseased animals. The buyer failed to comply with this requirement and was barred from recovery under the terms of the warranty.

Ill.App.3d 350, 4 Ill.Dec. 793, 360 N.E.2d 1168 (1977), the buyer alleged breach of warranty because a printing press it had purchased failed to operate properly. The seller defended by contending the defects in the press were caused by buyer misuse. The buyer had modified the press by adding makeshift rollers to it and allegedly had failed to correctly maintain and operate the press. The *Burrus* court agreed that the buyer had, in effect, misused the press by modifying it in an unauthorized manner. But the court did not halt its inquiry at this point and denied the seller's motion for summary judgment. Instead, it weighed the evidence and determined the actions of the buyer had not had an appreciable effect on the operation of the press, noting that evidence of defects in the goods occurring immediately after delivery is strong proof that the defects were caused by improper design rather than buyer misuse.

The district court followed a similar approach to that taken in *Burrus* in weighing the Sellers' evidence of misuse. It properly placed the burden of proving the breach of warranty on the Buyer and found that the breakdowns during the period in which the 5165 crusher was in use directly resulted from the Sellers' breach of warranty of capacity. But it also found the Buyer had misused the goods by failing to correctly maintain them and by dynamiting in the mouth of the crusher. This misuse, although minor, did contribute to the problem of inadequate production capacity.

We have carefully reviewed the record and agree with the district court's finding that improper design was the principal cause of the primary system's deficien-

cies. And, while the Buyer may have misused the equipment to some degree, such misuse was not sufficient to bar recovery for breach of warranty. The pattern of excessive breakdowns began immediately after the equipment was installed, which as the *Burrus* court noted is "strong evidence against a finding that the problems were caused by improper maintenance." Additionally, the cracks in the crusher rotor developed on days when there had been no dynamiting. Indeed, some of the dynamiting was done in the presence of the Sellers' agents who later inspected the crusher and found no evidence of damage. Thus, we find substantial evidence in the record supporting the district court's finding of breach of warranty of capacity and the court was not clearly erroneous in refusing to accept the Sellers' theory of buyer misuse as a total defense to this breach.

### *Production Cost Damages.*

The district court awarded the Buyer $311,115.00 in damages for breach of warranty of capacity. This figure included $10,000.00 for labor costs incurred by the Buyer in repairing and replacing improperly designed equipment and $1,115.00 for miscellaneous expenses. The remaining $300,000.00 related to excessive production costs incurred during the eight months in which the 5165 crusher was operational. As the court noted, its task in assessing damages was complicated by the fact that the Buyer's evidence of damages related to its claim of breach of an average production warranty. Since the court determined the Sellers had only made a warranty of capaci-

---

The *Willis* case illustrates that a seller can limit his liability for breach of warranty by limiting the scope of the warranty itself. It is, of course, necessary that the seller comply with the provisions of the Uniform Commercial Code governing the limitation and modification of warranties. *See* Ill.Rev.Stat. ch. 26, § 2–316. If conditions placed on the warranty are deemed effective, the buyer must comply with them so that his rights under the warranty will come into existence. The *Willis* court did not, however, address the distinct issue which now faces this court, that is, whether a minor misuse of the goods which does not violate an express condition of the warranty will operate as a matter of law to bar the buyer's remedy for breach.

It is true that the Seller in this case recommended against dynamiting in the crusher, but this *recommendation* cannot be fairly read as an express limitation on the scope of the Sellers' warranty of production capacity and the district court did not treat it as such. Thus, we must determine whether and to what degree the defects in the primary system were caused by the Sellers' breach of warranty of capacity. The degree of buyer misuse must, of course, be considered in reaching this determination.

ty, it disallowed costs incurred by the Buyer in modifying the primary system to produce an average of 1,000 t. p. h. of crushed limestone. It also rejected as too speculative the Buyer's claim for lost profits caused by insufficient production. But the court found support for its finding of production cost damages in Buyer's Exhibit 60, an elaborate comparison of production costs before and after the larger, 1,400 t. p. h. became fully operational. On appeal, the Sellers argue that this exhibit, which admittedly contains the only evidence of excessive production costs before the district court, fails to support the $300,000.00 damage figure. Or, more simply, they contend the court's award was too speculative and uncertain. We disagree.

Buyer's Exhibit 60 compared the production costs incurred during the twenty months from September 1, 1972 to April 30, 1974 with the production costs incurred during the following twelve months. It was the Buyer's theory that the primary system had reached its warranted production level on May 1, 1974 and that the following twelve months reflected normal production costs. And it sought excessive production cost damages for the previous twenty months, which ranged from the date the original primary system became operational until the May, 1974 cut-off date. The Buyer calculated the difference between the per ton production costs for the two periods and multiplied this figure by the total number of tons of crushed limestone produced during the twenty months. In its view, this calculation established excessive production cost damages of over $800,000.00 for the alleged twenty month period of breach.

■ The district court, as noted, found the Sellers had breached a warranty of capacity rather than one of average production. This breach existed during the first eight months of the twenty month period set out in Exhibit 60 and terminated when the 1,400 t. p. h. crusher was installed. Thus, the exhibit contained raw production cost data relative to the issue of damages for breach of the warranty of capacity and was properly considered by the court in ruling on this issue.

The Sellers assert that the district court rejected Exhibit 60 in its entirety and consequently had nothing on which to base its estimate of production cost damages. This is a misreading of the court's memorandum and order. It is true that the court found the comparison of the two time periods in Exhibit 60 to be inherently unfair. The twenty month period included a two month plant shutdown which was unrelated to defects in the equipment. Also, two winters of reduced production were included in the longer period. And the comparison did not take into account the Buyer's contributory fault for some of the shutdowns. But the exhibit did contain evidence of production cost damages for the period of breach which was considered by the court in reducing the Buyer's estimate of damages. We must now determine whether the court's award was uncertain and speculative.

■ The Buyer was entitled to those incidental and consequential damages proximately flowing from the breach of warranty. Ill.Rev.Stat. ch. 26, § 2–715. It was not necessary that the damage figure be established with a mathematical certainty but only that the Buyer establish a basis for a reasonably certain computation. *Karlen v. Butler Mfg. Co.,* 526 F.2d 1373 (8th Cir. 1975); *Dean Foods v. Albrecht,* 396 F.2d 652 (8th Cir. 1968). As Comment four to § 2–715 indicates, the Uniform Commercial Code's policy favoring liberal administration of remedies "rejects any doctrine of certainty which requires almost mathematical precision in the proof of loss. Loss may be determined in any manner which is reasonable under the circumstances."

■ The district court was aware of these principles and so stated in its order. It felt that the evidence in Exhibit 60 enabled it to make a reasonable determination of production cost damages without speculation or conjecture. Although the court did not accept the $800,000.00 estimate of the Buyer, it did weigh the evidence supporting this estimate and ultimately reduced it to $300,000.00. The court specifically stated the reasons why the Buyer's

estimate was improper and noted those items which it rejected. We agree with the court's finding that the Buyer was undoubtedly hampered in the production of crushed stone and that it was caused to suffer excessive production costs. And, based on the record before us, we cannot say that the court erred in setting a reasonable figure for this item of damages at $300,000.00.

*Prejudgment Interest.*

■■■■ The district court, without comment, denied the Sellers' counterclaim for prejudgment interest on the unpaid balance of the purchase price of the rock crushing equipment. This claim was brought pursuant to Ill.Rev.Stat. ch. 74, § 2 which provides in pertinent part that

> [c]reditors shall be allowed to receive at the rate of five (5) per centum per annum for all moneys after they become due on any bond, bill, promissory note, or other instrument of writing . . . .

This provision is applicable here since the purchase orders signed by the Buyer were written instruments which stated the purchase price of the equipment. And, under the Illinois Commercial Code, the Buyer's liability for this amount accrued when it accepted the goods. Ill.Rev.Stat. ch. 26, § 2–607. This was presumably in August of 1972 when the rock crushing equipment was delivered to the Buncombe plant. Ill.Rev. Stat. ch. 26, § 2–606(1). Once the goods were accepted, the Buyer could not raise any defects in them as a defense to its contractual liability for the purchase price. Instead, it was limited to its breach of warranty damages in regard to accepted goods. Ill.Rev.Stat. ch. 26, § 2–714; *Murray v. Kleen Leen, Inc.,* 41 Ill.App.3d 436, 354 N.E.2d 415 (1976); *Brule C. E. & E., Inc. v. Pronto Foods Corp.,* 3 Ill.App.3d 135, 278 N.E.2d 477 (1971). Consequently, the Sellers had a right to the stated purchase price and to prejudgment interest on that amount from the date of acceptance as a matter of Illinois law; and the district court erred in denying the counterclaim for such interest.

Affirmed in part; reversed in part and remanded for proceedings consistent with this opinion.